[Cite as *State v. Hall*, 2025-Ohio-3199.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
MEIGS COUNTY

STATE OF OHIO,                              :

                    Plaintiff-Appellee,     :    Case
No.  22CA12

          v.                                :

JAQUAN HALL,                                :    DECISION AND
                                                 JUDGMENT ENTRY

          Defendant-Appellant.       :

_____

APPEARANCES:

Kort Gatterdam and Michael B. Rogers, Columbus, Ohio, for
appellant.[1]

James Keith Stanley, Meigs County Prosecuting Attorney, Pomeroy,
Ohio, for appellee.

_____

CRIMINAL APPEAL FROM COMMON PLEAS COURT
DATE JOURNALIZED:8-29-25
ABELE, J.

     {¶1}  This is an appeal from a Meigs County Common Pleas

Court judgment of conviction and sentence.  A jury found Jaquan

Hall, defendant below and appellant herein, guilty of the

following offenses: (1) aggravated murder, in violation of R.C.

2903.01(A), with a firearm specification; (2) murder, in

_____

     [1] Different counsel represented appellant during the trial
court proceedings.

2

violation of R.C. 2903.02(A), with a firearm specification; (3) complicity to aggravated murder or murder, in violation of R.C. 2923.03(A)(2); and (4) conspiracy, in violation of R.C. 2923.01(A)(2).  The trial court merged the offenses and sentenced appellant to a mandatory three-year prison term for the firearm specification and to life without parole for the aggravated-murder offense.

{¶2}     Appellant assigns the following errors for review:

FIRST ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED IN REFUSING TO CHANGE VENUE.  SAID ERROR DEPRIVED APPELLANT OF HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO A FAIR AND IMPARTIAL JURY AND DUE PROCESS OF LAW."

SECOND ASSIGNMENT OF ERROR:

"APPELLANT WAS DEPRIVED OF HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO A FAIR AND IMPARTIAL JURY UNDER THE SIXTH AND FOURTEENTH AMENDMENTS WHEN THE ONLY AFRICAN-AMERICAN JUROR WILLING TO SIT WAS IMPROPERLY REMOVED FOR CAUSE."

THIRD ASSIGNMENT OF ERROR:

"THE TRIAL COURT DEPRIVED APPELLANT OF HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL UNDER THE OHIO AND UNITED STATES CONSTITUTIONS WHEN THE COURT ALLOWED THE MOTHER OF THE VICTIM TO WEAR A 'JUSTICE FOR [K.R.]' T-SHIRT DURING INDIVIDUAL VOIR DIRE IN CHAMBERS."

FOURTH ASSIGNMENT OF ERROR:

"APPELLANT'S RIGHTS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND *MIRANDA V. ARIZONA*, 384 U.S. 436 (1966) WERE VIOLATED WHEN EVIDENCE OF APPELLANT'S POST-*MIRANDA* SILENCE WAS ADMITTED INTO EVIDENCE BY THE STATE."

FIFTH ASSIGNMENT OF ERROR:

"THE PROSECUTION PRESENTED IMPROPER VICTIM-IMPACT EVIDENCE THAT INFLAMED THE JURY AND AFFECTED THE OUTCOME OF APPELLANT'S TRIAL CONTRARY TO APPELLANT'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL."

SIXTH ASSIGNMENT OF ERROR:

"THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN IT ENTERED A JUDGMENT OF CONVICTION BASED ON INSUFFICIENT EVIDENCE AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION

4

OF APPELLANT'S RIGHTS UNDER THE UNITED
STATES AND OHIO CONSTITUTIONS."

SEVENTH ASSIGNMENT OF ERROR:

"APPELLANT WAS DEPRIVED OF THE EFFECTIVE
ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF
APPELLANT'S RIGHTS UNDER THE SIXTH AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION, AND SECTION 10 AND 16, ARTICLE
I OF THE OHIO CONSTITUTION."

EIGHTH ASSIGNMENT OF ERROR:

"PROSECUTORIAL MISCONDUCT DEPRIVED APPELLANT
OF HIS RIGHTS TO DUE PROCESS AND TO TRIAL BY
AN IMPARTIAL JURY CONTRARY TO THE FIFTH,
SIXTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION AND CORRESPONDING
PROVISIONS OF THE OHIO CONSTITUTION."

{¶3} Appellant also raises the following supplemental

assignment of error:

"APPELLANT'S CONVICTION FOR CONSPIRACY MUST
BE REVERSED FOR FAILING TO ALLEGE AN OVERT
ACT IN LIGHT OF THIS COURT'S HOLDING IN
*STATE V. NELSON*."

**BACKGROUND**

{¶4} On April 4, 2021, around 4:45 a.m., Dave Berry awoke

to the sounds of shouting and two shotgun blasts. He

immediately called 9-1-1 to report the shotgun blasts and to

request law enforcement officers to respond to investigate. Berry then went outside and heard his neighbor, K.R., state that he needed to go to the hospital. Berry found K.R. lying in a fetal position on the ground outside of Berry's house, and K.R. was saturated with blood. Berry observed that K.R. had two shotgun blasts to the back of his shoulders. Berry returned inside to call 9-1-1 and after the 9-1-1 dispatcher assured Berry that help was on the way, Berry returned to K.R. to find out what had happened. When Berry asked K.R. who had shot him, K.R. responded he did not know him, but identified the person as "some black guy." Berry remained with K.R. until emergency responders arrived.

{¶5}    When the emergency responders arrived, medic Steven Vincent noticed two fist-sized holes across K.R.'s back. The medics placed K.R. in the ambulance and attempted life-saving measures. At the same time, law enforcement officers began to search the scene for clues to identify the person or persons responsible for K.R.'s death.

{¶6} Before the emergency squad had departed, Meigs County Sheriff's Sergeant Donald Mohler spotted in the roadway two shotgun shells and a pair of black shorts.  To prevent these items from being damaged from the emergency squad's vehicle, Sergeant Mohler removed these items from the roadway and marked the location of each item with a pen.  After the emergency squad left, he returned each item to its original location for photographing.

{¶7}  Tragically, en route to the hospital K.R. started to succumb to the mortal wounds that had been inflicted, and medical personnel were unable to save K.R.'s life.  An autopsy later revealed that K.R. had sustained a shotgun wound to the back of his head, two shotgun wounds to his upper back, a gunshot wound to his lower back, a gunshot wound to his left buttock, and two gunshot wounds to his right thigh.

{¶8}  As officers continued to search the scene, Meigs County Sheriff's Deputy Scott Spiker noticed a Crown Royal bag sitting on his cruiser's hood.  The bag contained an empty box

of 12-gauge shotgun shells.  Neither Deputy Spiker nor any of the other officers knew how the bag ended up on the cruiser.

{¶9}   The investigation continued, and on June 17, 2021, a Meigs County Grand Jury returned an indictment that charged appellant with (1) aggravated murder, in violation of R.C. 2903.01(A); (2) murder, in violation of R.C. 2903.02(A); (3) complicity to aggravated murder or murder, in violation of R.C. 2923.03(A)(2); and (4) conspiracy, in violation of R.C. 2923.01(A)(2).  The indictment also included firearm specifications for the aggravated-murder and murder offenses. Appellant entered a not guilty plea to each count.

{¶10}  Officers later identified two other individuals involved in K.R.'s death:  Keontae Nelson and Richard Walker. Both were indicted.  Walker eventually agreed to plead guilty in exchange for testifying truthfully at Nelson's and appellant's trials.

**Jury Selection**

{¶11}  On September 19, 2022, the jury-selection process began.  On the first day of individual voir dire, after the

parties had questioned the third prospective juror, appellant's counsel observed that the victim's parents had been present during individual voir dire and noticed that the victim's mother's "Justice for [K.R.]" shirt.  He stated that the shirt was inappropriate and prospective jurors should not be permitted to see the mother's shirt.  The prosecutor, however, did not believe the shirt inappropriate.  The trial court agreed.  However, the court later reconsidered and instructed the parents not to wear the shirts inside the courtroom.

{¶12}  During voir dire, many of the questions concerned prospective jurors' exposure to pretrial publicity.  Most prospective jurors had heard about K.R.'s death.  A few, however, had not heard anything at all about K.R. or his death, until they entered the courtroom to report for jury duty.  For example, one prospective juror stated that she did not "know anything about any of it" and did not know that a homicide had happened until the day that she reported for jury duty.  Another prospective juror likewise stated that she did not know anything about the case.  The trial court excused any prospective juror

who indicated that pretrial publicity would influence the juror's ability to be fair and impartial.

{¶13} Additional questions involved prospective jurors' knowledge of community sentiment as a result of exposure to signs, bumper stickers, and shirts that stated, "Justice for [K.R.]." Many prospective jurors had seen the signs placed throughout the community. Some reactions to the signs included uncertainty as to the meaning of the signs. Other prospective jurors thought that the signs displayed disdain for law enforcement officers allegedly dragging their feet, while others thought that the signs intended to show support for the victim's family. In any event, the court excused any prospective juror who indicated that the signs or community sentiment would influence the juror's ability to be fair and impartial.

{¶14} Some race-based questions also arose. Appellant's counsel noted that appellant, who is black, likely would be judged before an all-white jury. One prospective juror questioned whether appellant could receive a fair trial in Meigs County. This prospective juror further stated, however, that he

is not racist and that appellant could receive a fair trial if all 12 jurors were "just like [him]."  After the parties finished questioning this prospective juror, appellant asked the court to change the venue for the trial.  The trial court denied the motion as premature.

**{¶15}**  Appellant later again asked the court to change the venue because none of the prospective jurors questioned up to that point had been a "person of color."  He expressed concerns regarding the lack of any African Americans who had been summoned and the familiarity among jurors, the prosecution, and court staff.  He asked the court to move the case "to another county where there would be more diversity, where there would be a large population, where people wouldn't know one another."  He also stated that the victim had a reputation in the community as a "local football hero" and his family was well-known. Appellant additionally asserted that the "Justice for [K.R.]" signs placed throughout the community were designed to influence the jury pool and to ensure a conviction.  He stated that, given

11

these circumstances, the court would not be able to provide appellant with a fair trial.

{¶16} The trial court denied appellant's motion to change venue. The court stated that, in small counties, familiarity among community members is common and does not necessitate changing venue. The court thus continued the voir dire process to attempt to seat a fair and impartial jury.

{¶17} One prospective juror, L.G.,[2] is an African American whose son had been friends with the victim. L.G. indicated that the victim had been to her home "quite a bit." She explained, however, that she frequently worked and never had been home when the victim was there.

{¶18} L.G. also stated that she had seen appellant in the past. She did not recall when she saw him, but she had been

---

[2] We note that the trial court had informed the prospective jurors that answers provided during individual voir dire would be kept private. Thus, although appellant's brief freely uses jurors' actual names, this opinion uses initials or abbreviated last names when the first initial is unknown (the trial court record does not contain a list that refers to prospective jurors by numbers).

with some friends when they stopped to talk to another group of people.  Appellant was among this group of people.

{¶19}  The prosecutor asked the court to excuse L.G. based upon her connection to the victim.  Appellant's counsel objected and noted that L.G. had been "the only African American juror" who has been through voir dire.  Appellant's counsel pointed out that, even though the victim had been in L.G.'s home, she had never met him.  Counsel further observed that L.G. indicated that she could be fair and impartial.

{¶20}  The prosecutor countered that the court had dismissed prospective jurors who had less of a connection to the victim or his family.

{¶21}  The court decided to excuse L.G. and explained its rationale as follows:

> And I'm as concerned as anything about her brother, who, you know, if her brother is. . .she probably has very strong feelings about the judicial system because of her brother. Uh, as well as her obvious connection with people that, um, have relationships . . . that had relationships with [the victim] and/or with Mr. Hall, uh, prior to [the victim]'s death and that's as close as we've ever had with, uh, most of these people have just been connected to, uh, work with either, uh, the victim's

mother or that work with the victim's father and we have dismissed all of those people for cause.  So, I'd like to keep her, but I think she's just too close to too many situations.

**{¶22}**  After questioning all of the remaining prospective jurors, the State exercised one of its peremptory challenges, and appellant exercised three of his four peremptory challenges. The parties then had selected a panel of 12 jurors.

**{¶23}**  The parties next questioned the first four alternates. Appellant exercised a peremptory challenge to excuse one of the four alternates.  The court called the next alternate juror, and both parties waived any challenges.  Having selected 12 jurors and 4 alternate jurors, the parties proceeded to give opening statements.

## The Prosecution's Opening Statement

**{¶24}**  The prosecutor informed the jury that the State expected the evidence would show that early in the investigation, officers decided to contact area hospitals to ask whether, on the date of the victim's death, anyone had presented with a gunshot wound.  Officers eventually discovered that a few

hours after the victim had been shot, a person had presented to a Charleston, West Virginia hospital with a gunshot wound to the upper arm. The injured person checked in to the hospital using the name Johnson Ball and indicated that he was from New York. This individual reported that he had been shot while attending a party somewhere in Charleston.

**{¶25}** Hospital staff contacted the Charleston Police Department pursuant to standard operating procedures when a person presents with a gunshot wound. At the time, Charleston police were unaware that a murder had occurred in Meigs County. When officers arrived to speak with the injured person, they attempted to verify his identity but were unable to verify Johnson Ball's name and date of birth. The officers advised the injured person that they could not verify his identity, and this person eventually admitted that his name was Jaquan Hall. Appellant informed officers that he did not wish to share any additional information about the shooting and did not want to cooperate with them. Appellant advised officers that he was a victim.

**Motion for Mistrial**

**{¶26}** After the State finished its opening statement, appellant asked the court to declare a mistrial. Appellant asserted that during the State's opening statement, the prosecutor "told the jury that [appellant] exercised his right to remain silent and to not cooperate with the police while he was at the hospital in Charleston, West Virginia." Appellant argued that the State may not comment on a defendant's decision to exercise the right to remain silent or a defendant's choice not to speak to police. He claimed that the prosecutor's statement was an improper comment on his right to remain silent. Appellant contended that the prosecutor's comments were so prejudicial that the court should declare a mistrial.

**{¶27}** The prosecutor, however, denied that he had improperly commented on appellant's right to remain silent. The prosecutor asserted that, when appellant was in the Charleston hospital, the officers had not been questioning him in connection with any homicide, but attempted to investigate appellant's statement that he had been shot. The prosecutor thus stated that the

officers were not questioning appellant as a suspect, but as an alleged victim of a shooting. The prosecutor claimed that nothing prohibited "the State from indicating that [appellant] failed to cooperate or refused to cooperate with a case in which he was the alleged victim." The prosecutor argued that an alleged victim's refusal to speak with officers is not an improper comment on an accused's right to remain silent.

**{¶28}** Appellant did not agree that the statement related only to the officers' investigation into whether appellant had been a victim. He stated that the prosecutor presented the evidence in relation to the investigation into the victim's murder. He further stated that if the prosecutor did not intend for the jury to consider appellant's refusal to cooperate as evidence of his guilt, then the prosecutor would have not had a reason to mention it. Appellant's counsel argued that the State could not reference any unwillingness to cooperate that appellant may have displayed to law enforcement, even if it was as a victim.

**{¶29}** The trial court overruled appellant's motion for a mistrial and pointed out that it instructed the jury that opening statements are not evidence, and further noted that, at the time appellant advised Charleston police that he did not wish to cooperate, the officers did not know about the victim's murder and had talked to appellant to investigate the gunshot wound. The court indicated that, after appellant finished his opening statement, it would instruct the jury that the State could not use appellant's silence as evidence of guilt. The court also cautioned the State to refrain from mentioning appellant's lack of cooperation with law enforcement officers. The court concluded that these solutions remedied appellant's concern.

### Appellant's Opening Statement

**{¶30}** Appellant's counsel asserted that appellant did not murder the victim. He stated that appellant and the victim knew each other and suggested that if appellant had shot the victim, the victim would have identified appellant as the person who shot him, rather than stating that "some black guy" shot him.

Appellant's counsel indicated that if appellant had been present at the crime scene, then the victim would have identified appellant when the neighbor asked the victim who shot him.

**{¶31}** Appellant's counsel additionally asked the jury to question the testimony that they would hear from one of appellant's alleged accomplices, Richard Walker.

**{¶32}** Defense counsel further asserted that the State lacked sufficient physical evidence to prove that appellant shot the victim. He agreed that although the State possessed DNA evidence that placed appellant at the scene, the State did not have any DNA or fingerprint evidence that would show that appellant used a weapon to shoot the victim. Defense counsel argued that appellant's mere presence was not sufficient evidence to convict him.

**Trial**

**{¶33}** At trial, the State presented evidence that appellant, Nelson, and Walker drove to the victim's house with the intent to murder him. Appellant reportedly was upset with the victim

for telling law enforcement officers that appellant was selling marijuana.

{¶34}  To support its case, the State introduced, inter alia, the following testimony and evidence.  Officers discovered a pair of shorts at the murder scene, and DNA collected from this pair of shorts matched appellant's DNA.  Additionally, on the hood of a patrol cruiser that had been parked at the scene, officers found a Crown Royal bag that contained shotgun shells. The bag on the outside had appellant's and Nelson's DNA.

{¶35}  Officers later learned that on April 4, 2021, appellant had appeared at a West Virginia hospital with a gunshot wound.  Appellant did not want to cooperate with officers who inquired about the source of his gunshot wound, but did tell them that he had been shot while at a party in Charleston, West Virginia.  Officers could not corroborate appellant's statement.

{¶36}  In August 2021, a bullet that had lodged in appellant's arm began to protrude and required appellant to obtain medical treatment to remove the bullet.  Subsequent

testing indicated that the bullet removed from appellant's arm was fired from the same weapon as the one used to shoot the victim.

{¶37} Other evidence included copies of a letter that appellant purportedly had written while he was in jail awaiting trial. In the letter, appellant urged the recipient to tell a story about the murder that would save appellant from receiving a life sentence. The letter instructed the recipient to talk to appellant's lawyer and tell the lawyer that appellant did not shoot the victim. One page of the letter also contained a written phrase that stated, in all capital letters, "burn notice."

{¶38} The State additionally presented testimony from Danielle Runyon, appellant's ex-girlfriend. Runyon also had an on-and-off relationship with the victim. After she heard about the victim's murder, she called appellant. Runyon was unable to reach appellant and began to "suspect that he was involved." Around 3 p.m. that same day, she finally connected with appellant, and he acted "like nothing was going on." Runyon

told appellant about the victim's murder, and "he had nothing to say about it." Runyon thus thought that appellant might have been involved in the victim's murder. She stated that appellant "would've been the first person" that she thought would be responsible for the murder. Runyon explained that appellant was aware that she had been "messing around with [the victim]."

{¶39} Richard Walker testified that about a week before the victim's death, appellant had been talking about killing the victim. Appellant believed that the victim had been "telling on" appellant for selling marijuana.

{¶40} Walker testified that around midnight on April 4, 2021, the night of the murder, he and Nelson rode with appellant to the victim's house. Once they arrived at the victim's house, appellant parked the car in an empty parking lot across the street and they retrieved weapons from the trunk. Appellant carried a 12-gauge shotgun, Nelson carried a .45-caliber Hi-Point gun, and Walker carried an inoperable pink and black gun. Armed with these weapons, they walked across the street to the victim's house.

{¶41} When the trio reached the victim's house, Nelson knocked on the door, while appellant and Walker stood to the right side. The victim opened the door, and Nelson asked if he could use the victim's phone. The victim stated, "yes, I guess so." Appellant then hit the victim "with the butt edge of the shotgun." Walker did not recall where appellant hit the victim, but the hit caused the victim to stumble back. Appellant, Nelson, and Walker then entered the house.

{¶42} Walker held the victim at gunpoint, and appellant and Nelson searched the house for marijuana, drugs, and money. The victim told the group that he did not have "anything." Still, appellant and Nelson found the victim's wallet and took the money that it contained. They also took the victim's cell phone. After they were done, appellant told Nelson, "you know what to do." Nelson then shot the victim three to four times. Nelson also accidentally shot appellant in the arm.

{¶43} After he was shot, the victim fell down the stairs. Walker and Nelson ran to the car. Walker then heard two loud gunshots. Appellant returned to the car and "said let's go[;] I

got shot." Walker drove the car back to Charleston. Along the way, Nelson discarded the victim's phone and wallet. When they returned to Charleston, they went to appellant's uncle's house to inform appellant's uncle that appellant had been shot.

{¶44} After Walker's testimony, the State rested. Appellant did not present any evidence in his defense.

{¶45} Subsequently, the jury found appellant guilty of all offenses as charged in the indictment. The parties agreed that the offenses merged for sentencing purposes, and the court sentenced appellant to a mandatory three-year prison term for the firearm specification and to life without parole for the aggravated murder offense. This appeal followed.

**I**

**Fair Trial Issues**

{¶46} In his first three assignments of error, appellant assigns various errors that allegedly deprived him of a fair trial. In his first and second assignments of error, appellant charges that the trial court deprived him of due process and his right to a fair and impartial jury by (1) failing to transfer

the venue of the trial and (2) dismissing for cause the only African American prospective juror.  In his third assignment of error, appellant contends that the trial court deprived him of due process and a fair trial by allowing the victim's mother to wear a "Justice for [K.R.]" shirt during the first day of individual voir dire.  The same constitutional principles guide our review of these three assignments of error.  We thus first set forth those principles.

**A**

**Constitutional Principles**

{¶47}  The Fifth Amendment to the United States Constitution provides that no person shall "be deprived of life, liberty, or property, without due process of law."  U.S. Const., amend. V.  "'A fair trial in a fair tribunal is a basic requirement of due process,'" *Irvin v. Dowd*, 366 U.S. 717, 722 (1961), quoting *In re Murchison*, 349 U.S. 133, 136 (1955), as well as "a

fundamental liberty secured by the Fourteenth Amendment,"[3] *Estelle v. Williams*, 425 U.S. 501, 503 (1976). "Fairness . . . requires an absence of actual bias in the trial of cases." *In re Murchison*, 349 U.S. 133, 136 (1955).

**{¶48}** Additionally, the Sixth Amendment to the United States Constitution guarantees criminal defendants the right to a trial "by an impartial jury of the State and district wherein the crime shall have been committed."[4] U.S. Const., amend. VI; *accord Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 551 (1976). At its core, the right to a trial by an impartial jury "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin*, 366 U.S. at 722, citing *In re Oliver*, 333 U.S. 257 (1948), and *Tumey v. Ohio*, 273 U.S. 510 (1927).

---

[3] The Fourteenth Amendment provides that a state may not "deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV.

[4] The Sixth Amendment applies to the states via the Fourteenth Amendment. *See, e.g., Ramos v. Louisiana*, 590 U.S. 83, 93 (2020).

**{¶49}** With these principles in mind, we consider appellant's first three assignments of error.

**B**

**First Assignment of Error**

**{¶50}** In his first assignment of error, appellant asserts that the trial court erred by overruling his motion to change the venue of the trial. He contends that pervasive, adverse pretrial publicity created a presumption that the jury was prejudiced against him. Appellant claims that "the entire county was inundated with news of the most infamous crime in recent Meigs County history on the television, in the newspapers, on social media, and in front yards" and that a "battery of adverse publicity . . . besieged Meigs County for an entire year before [appellant]'s trial." Appellant further asserts that the trial court should not have believed any of the jurors' attestations that, despite the pretrial publicity, they could be fair and impartial.

**{¶51}** Appellant additionally contends that he, as a black man facing trial for the death of a white man, could not receive

a fair trial in Meigs County, a predominantly white county.  He observes that a few prospective jurors made comments regarding appellant's race, with more than one asking whether appellant could receive a fair trial in Meigs County.

{¶52}  The State argues that the trial court did not abuse its discretion by overruling appellant's motion for a change of venue.  The State asserts that appellant has not shown that "the pretrial publicity in this case was so pervasive" as to warrant a prejudice presumption.

{¶53}  The State further argues that appellant has not shown that any juror actually was biased against him.  The State contends that "[h]undreds of jurors sat through individual voir dire over the course of multiple days to ensure a fair jury was selected, and a fair jury was in fact selected."  The State notes that the trial court routinely excused jurors who knew "too much about the case or who were too close to anyone involved in the case or too close to their family members" and kept as prospective jurors the individuals who had "no or limited knowledge of the case."  The State further contends that

each juror who was "seated in this case affirmed that he or she would be fair and impartial despite what they may have already heard or saw regarding the case."

{¶54} The State also observes that appellant did not renew his request for a change of venue after the jury had been selected and that he did not exercise all of his peremptory challenges. The State contends that, by failing to do so, appellant indicated that he was satisfied that the empaneled jurors would be fair and impartial and cannot assert error on appeal.

**1**

**Standard of Review**

{¶55} Appellate courts ordinarily will not disturb a trial court's ruling concerning a motion for change of venue absent an abuse of discretion. *State v. Clinton*, 2017-Ohio-9423, ¶ 60; *State v. Roberts,* 2006-Ohio-3665, ¶ 116. An abuse of discretion implies that a court's attitude was unreasonable, arbitrary or unconscionable. *State v. Beasley*, 2018-Ohio-16, ¶ 12, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "A

decision is unreasonable if there is no sound reasoning process that would support that decision." *State v. Ford*, 2019-Ohio-4539, ¶ 106, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). "[A]n 'arbitrary' decision is one made 'without consideration of or regard for facts [or] circumstances.'" *State v. Beasley*, 2018-Ohio-16, ¶ 12, quoting *Black's Law Dictionary* (10th Ed.2014), and citing *Dayton ex rel. Scandrick v. McGee*, 67 Ohio St.2d 356, 359 (1981), quoting *Black's* (5th Ed.1979) ("arbitrary" means "'without adequate determining principle; . . . not governed by any fixed rules or standard'"). An unconscionable decision is one "showing no regard for conscience" or "affronting the sense of justice, decency, or reasonableness." *Black's* (11th ed. 2019). An unconscionable decision also may be characterized as "[s]hockingly unjust or unfair." *Id.* Moreover, when reviewing for an abuse of discretion, appellate courts must not substitute their judgment for that of the trial court. *E.g., State v. Grate*, 2020-Ohio-5584, ¶ 187; *In re Jane Doe 1*, 57 Ohio St.3d 135, 137-138 (1991).

**{¶56}** The abuse-of-discretion standard of review does not apply, however, if a defendant fails to object to the jury pool at trial. *See State v. Gordon*, 2018-Ohio-259, ¶ 22 (plain-error, not abuse-of-discretion, standard of review applied when defendant failed to seek severance under Crim.R. 14 or to object to joint trials). Instead, failing to object to the jury pool at trial means that the defendant forfeits "all but plain error" on appeal. *State v. Graham*, 2020-Ohio-6700, ¶ 31 ("defense counsel failed to object to the jury pool at trial and thus forfeited all but plain error").

**{¶57}** Likewise, a defendant who failed to exhaust the allotted peremptory challenges forfeits all but plain error. *State v. Trimble*, 2009-Ohio-2961, ¶ 61 (defendant forfeited argument that trial court erred by overruling motion to change venue due to "his failure to exhaust his peremptory challenges"); *State v. Hale*, 2008-Ohio-3426, ¶ 89, quoting *State v. Carter*, 21 Ohio St.2d 212, 214 (1970) (because defendant "'did not exhaust his peremptories,'" he "'acquiesced in the jury that was finally selected'"); *State v. Lynch*, 2003-Ohio-

2284, ¶ 37 ("The absence of defense challenges for pretrial publicity and the failure to exhaust defense peremptory challenges indicate that the defense was not particularly troubled by the jury's exposure to pretrial publicity once voir dire was completed.").

**{¶58}** In the case at bar, after the parties completed voir dire, they had selected 12 petit jurors and 4 alternate jurors. After the jury was seated, appellant did not raise any further concerns that he would be unable to receive a fair trial in Meigs County. Moreover, he did not exhaust all of his allotted peremptory challenges. Additionally, toward the end of voir dire, appellant's counsel agreed that the court should attempt to seat a jury using the prospective jurors who remained. Under these circumstances, we believe that appellant failed to preserve his argument that the trial court abused its discretion by failing to change the venue of the trial. We therefore will review this assignment of error using the plain-error standard of review.

**{¶59}** Appellate courts have discretion to consider "[p]lain errors or defects affecting substantial rights." Crim.R. 52(B); *e.g.*, *State v. Jones*, 2020-Ohio-3051, ¶ 17, quoting *State v. Rogers*, 2015-Ohio-2459, ¶ 23 ("An appellate court has discretion to notice plain error and therefore 'is not required to correct it.'"). A party asserting plain error must demonstrate the following: (1) an error occurred; (2) the error was obvious; and (3) a reasonable probability that the error affected the outcome of the proceeding. *State v. Echols*, 2024-Ohio-5088, ¶ 50. However, even when a defendant demonstrates that a plain error or defect affected the defendant's substantial rights, the Ohio Supreme Court repeatedly has emphasized that courts should "notice plain error 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002), quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus; *e.g.*, *State v. Bailey*, 2022-Ohio-4407, ¶ 14 ("the plain-error doctrine is warranted only under exceptional circumstances to prevent injustice").

**{¶60}** As we explain below, we do not believe that the record establishes that the trial court plainly erred by maintaining the venue of the trial in Meigs County.

**2**

**Pretrial Publicity**

**{¶61}** A panel of impartial, indifferent jurors is a necessary predicate to a fair trial. *See Irvin*, 366 U.S. at 722. Thus, "when it appears that a fair and impartial trial cannot be held in the court in which the action is pending," a criminal defendant may request the trial court to transfer the action to an appropriate tribunal. *See* Crim.R. 18(B); *accord* R.C. 2901.12(K); *State v. Mammone*, 2014-Ohio-1942, ¶ 53.

**{¶62}** Pretrial publicity may impair a jury's ability to be fair and impartial. *Mammone* at ¶ 53. Trial courts thus have "a 'duty to protect' criminal defendants from 'inherently prejudicial publicity' that renders a jury's deliberations unfair." *Id.* at ¶ 54, quoting *Sheppard v. Maxwell,* 384 U.S. 333, 363 (1966).

**{¶63}** Pretrial publicity does not, however, automatically establish that a fair and impartial trial cannot be held in the court in which the action is pending. *State v. Frazier*, 2007-Ohio-5048, ¶ 235; *accord Skilling v. United States*, 561 U.S. 358, 380 (2010), quoting *Murphy v. Florida,* 421 U.S. 794, 798–799 (1975) ("our decisions, however, 'cannot be made to stand for the proposition that juror exposure to . . . news accounts of the crime . . . alone presumptively deprives the defendant of due process'"). "Prominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*." (Emphasis in original.) *Skilling*, 561 U.S. at 381; *see Irvin*, 366 U.S. at 722 (jurors need not be "totally ignorant of the facts and issues involved"); *Reynolds v. United States*, 98 U.S. 145, 155-156 (1898) ("[E]very case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits."). Accordingly, "even pervasive,

adverse [pretrial] publicity does not inevitably lead to an unfair trial." *Nebraska Press Assn.*, 427 U.S. at 554.

**{¶64}** "'[T]he best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality' is 'a careful and searching voir dire.'" *Mammone*, 2014-Ohio-1942, at ¶ 55, quoting *State v. Bayless,* 48 Ohio St.2d 73, 98 (1976). Thus, a trial court ordinarily should make "'a good faith effort . . . to impanel a jury before . . . grant[ing] a motion for change of venue.'" *State v. Warner,* 55 Ohio St.3d 31, 46 (1990), quoting *State v. Herring,* 21 Ohio App.3d 18 (9th Dist.1984), syllabus.

**{¶65}** In rare cases, however, courts should presume that pretrial publicity prejudiced the jury against the defendant. *See Roberts*, 2006-Ohio-3665, at ¶ 117, citing *State v. Treesh*, 90 Ohio St.3d 460, 464 (2001). To prevail on a claim of presumed prejudice, a defendant must make "'a clear and manifest showing . . . that pretrial publicity was so pervasive and prejudicial that an attempt to seat a jury would be a vain act.'" *Warner*, 55 Ohio St.3d at 46, quoting *Herring* at

syllabus.  Notably, this presumption "attends only the extreme case."  *Skilling*, 561 U.S. at 381; *accord Clinton*, 2017-Ohio-9423, at ¶ 64.

**{¶66}**  When a defendant claims that a trial court erred by denying a motion for a change of venue based on pretrial publicity, a reviewing court first must "determine whether the record shows pretrial publicity of such a degree and kind as to trigger a presumption that the jury was prejudiced against the defendant." *Mammone*, 2014-Ohio-1942, at ¶ 57.  If the record fails to show this presumption, the court next must "determine whether the defendant has established that any juror was actually prejudiced against him."  *Id.*

**{¶67}**  In the case sub judice, as we explain below, nothing in the record suggests that the trial court obviously erred by failing to determine that pervasive pretrial publicity had tainted the jury pool so as to warrant a prejudice presumption. Additionally, the record does not indicate that any juror actually was prejudiced against appellant.  We therefore do not

believe that the trial court plainly erred by failing to transfer the venue of the trial.

*a*

### *Presumed Prejudice*

**{¶68}** The United States Supreme Court has presumed that pretrial publicity resulted in prejudice in rare cases. For example, the court applied the presumption when, before a defendant's arraignment, the defendant confessed to the crime while being filmed for a televised broadcast. *Rideau v. Louisiana*, 373 U.S. 723 (1963). The televised confession aired three times, *id.* at 725, fn. 2, and showed the defendant, "in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder, in response to leading questions by the sheriff," *id.* at 725. Tens of thousands of community members "had been exposed repeatedly and in depth to the spectacle of [the defendant] personally confessing in detail to the crimes with which he was later to be charged." *Id.* at 726.

**{¶69}**  After his arraignment, the defendant asked the trial court to change the venue for the trial.  The trial court denied the motion, and a jury later convicted the defendant of murder and sentenced him to death.

**{¶70}**  The state supreme court later affirmed the defendant's conviction, and the defendant successfully sought review in the United States Supreme Court.  The Court reversed the state supreme court's judgment.  The Court found that the televised "spectacle . . . in a very real sense was [the defendant]'s trial—at which he pleaded guilty to murder."  *Id.*  The Court determined that "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality."  *Id.*  The Court thus concluded that due process "required a trial before a jury drawn from a community of people who had not seen and heard [the defendant]'s televised" confession.  *Id.* at 727.

**{¶71}**  The Court also applied the prejudice presumption when "a barrage" of media reporting, *Irvin*, 366 U.S. at 725, had led two-thirds of the seated jurors to form an opinion that the

defendant was guilty, *id.* at 728.  In *Irvin*, during the months before the defendant's murder trial, the "barrage" of publicity "unleashed against him" included "curbstone opinions, not only as to [the defendant's] guilt but even as to what punishment he should receive."  *Id.* at 725.  A "roving reporter" "solicited and recorded" these opinions, and they "later were broadcast over the local stations."  *Id.*

Furthermore, news reporting

revealed the details of [the defendant's] background, including a reference to crimes committed when a juvenile, his convictions for arson almost 20 years previously, for burglary and by a court-martial on AWOL charges during the war. He was accused of being a parole violator.  The headlines announced his police line-up identification, that he faced a lie detector test, had been placed at the scene of the crime and that the six murders were solved but petitioner refused to confess. Finally, they announced his confession to the six murders and the fact of his indictment for four of them in Indiana.  They reported [the defendant's]  offer to plead guilty if promised a 99-year sentence, but also the determination, on the other hand, of the prosecutor to secure the death penalty, and that petitioner had confessed to 24 burglaries (the modus operandi of these robberies was compared to that of the murders and the similarity noted).  One story dramatically relayed the promise of a sheriff to devote his life to securing [the defendant's] execution by the State of Kentucky, where petitioner is alleged to have committed one of the six

> murders, if Indiana failed to do so. Another characterized petitioner as remorseless and without conscience but also as having been found sane by a court-appointed panel of doctors. In many of the stories [the defendant] was described as the 'confessed slayer of six,' a parole violator and fraudulent-check artist. . . . On the day before the trial the newspapers carried the story that [the defendant] had orally admitted the murder of Kerr (the victim in this case) as well as 'the robbery-murder of Mrs. Mary Holland; the murder of Mrs. Wilhelmina Sailer in Posey County, and the slaughter of three members of the Duncan family in Henderson County, Ky.'"

*Id.* at 725-726.

{¶72} The Court determined that this extensive pretrial publicity prejudiced the jury pool and that the trial court should have transferred the venue to another county. The Court explained, "With his life at stake, it is not requiring too much that [the defendant] be tried in an atmosphere undisturbed by so huge a wave of public passion and by a jury other than one in which two-thirds of the members admit, before hearing any testimony, to possessing a belief in his guilt." *Id.* at 728.

{¶73} Additionally, the Court presumed that publicity caused prejudice when the trial atmosphere resembled a "carnival," *Sheppard v. Maxwell,* 384 U.S. 333, 358 (1966), and when the

"media's overzealous reporting efforts," *Estes v. Texas,* 381 U.S. 532, 538 (1965), "utterly corrupted" the trial atmosphere, *Murphy v. Florida,* 421 U.S. 794, 798-799 (1975), citing *Sheppard* at 353 ("bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom," which thrust jurors "into the role of celebrities").

{¶74}  In the case sub judice, the record does not demonstrate a degree of pretrial publicity sufficient to trigger a presumption that the jury was prejudiced against appellant. We first observe that although appellant's counsel referred to published media reports regarding the murder—both shortly after it occurred and after appellant's arrest—the record does not contain any copies of these published media reports or otherwise establish that Meigs County citizens were inundated with news stories about the case.  Nothing in the record suggests that the media had unleashed a barrage of pretrial publicity, the trial resembled a "carnival atmosphere," or the media had "utterly corrupted" the trial atmosphere.

{¶75} Moreover, unlike the damaging publicity that inheres when a news organization broadcasts a defendant's televised confession, in the case at bar, appellant has not presented evidence that the news media or individuals on social media saturated the community with similar incriminating information. *See Skilling*, 561 U.S. at 382 (rejecting the defendant's argument that pretrial publicity prejudiced jury when, "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight"). Thus, "[n]o evidence of the smoking-gun variety invited prejudgment of his culpability." *Id.* at 383, quoting *United States v. Chagra,* 669 F.2d 241, 251-252, n. 11 (C.A.5 1982) ("'A jury may have difficulty in disbelieving or forgetting a defendant's opinion of his own guilt but have no difficulty in rejecting the opinions of others because they may not be well-founded.'"). Additionally, nothing in the record shows that the media presented "the kind of vivid, unforgettable information" that the United States Supreme Court has

43

"recognized as particularly likely to produce prejudice . . . ."
*Id.* at 384.

{¶76}  Furthermore, the voir dire transcript does not indicate that the jury pool was exposed to extensive adverse, pretrial publicity.  During voir dire, many prospective jurors stated that they had heard at least some information about the case.  The vast majority of them, however, had not heard a substantial amount of pretrial publicity.  Most of the prospective jurors who had heard some pretrial publicity had not heard more than a couple of news stories about the case, and those stories simply reported that a murder occurred and that an arrest had been made.

{¶77}  In addition, many prospective jurors who had exposure to pretrial publicity—whether in traditional news media or social media—stated that they had not formed any opinions based upon the news reports.  Thus, "[a]lthough most prospective jurors had heard or read something about the facts of the case, knowing something about media accounts of the crimes is not dispositive."  *Clinton*, 2017-Ohio-9423, at ¶ 66, citing *State v.*

44

*Thompson*, 2014-Ohio-4751, ¶ 102; *see also Mu'Min v. Virginia*, 500 U.S. 415, 427–30 (1991) ("substantial" amount of pretrial publicity was not sufficient to warrant a prejudice presumption).  Indeed, neither the Ohio Supreme Court nor the United States Supreme Court has extended the prejudice presumption to "'even the most highly publicized cases that are covered step-by-step and scoop-by-scoop in evening newscasts and front page stories.'"  *State v. Martin*, 2017-Ohio-7556, ¶ 35, quoting 6 LaFave, Israel, King & Kerr, *Criminal Procedure*, Section 23.2(a), at 307-308 (4th Ed.2015), and citing *Rideau*, 373 U.S. 723; *see also State v. Lundgren*, 73 Ohio St.3d 474, 478 (1995) (rejecting argument that trial court should have presumed prejudice and changed venue when the discovery of five dead bodies "resulted in massive, inflammatory, statewide publicity," including approximately 350 printed news articles with more than 90 front-page news articles and almost 350 televised news broadcasts).

{¶78} Additionally, appellant's counsel questioned jurors whether they had seen "Justice for [K.R.]" signs throughout the

45

community.  A few prospective jurors stated that they were

prevalent throughout the community, while a few others had not

seen them.  Most jurors did not interpret the signs as a call to

find appellant guilty.  Instead, some prospective jurors

interpreted the signs as being critical of law enforcement or

simply as a call for the victim's family to have a resolution.

Other prospective jurors stated that they were curious about the

signs but did not know what message they were intended to

convey.

{¶79}  Moreover, we again note that defense counsel did not

exercise all of his allotted peremptory challenges.

Additionally, after the jury had been seated, appellant did not

renew his motion to change venue based on pretrial publicity.

His failure to do so suggests that defense counsel was satisfied

with the jurors who had been selected.  See *Lynch*, 2003-Ohio-

2284, at ¶ 37.

{¶80}  Thus, appellant has not established that this case is

the rare case that warrants a presumption of prejudice, and the

trial court did not obviously err by failing to conclude that pretrial publicity warranted this presumption.

### b

### *Actual Prejudice*

**{¶81}** Having determined that appellant has not established that the prejudice presumption applies, we next consider whether appellant has shown that one or more jurors actually were prejudiced against him. *See Martin*, 2017-Ohio-7556, at ¶ 44.

**{¶82}** In the case at bar, the record does not suggest that pretrial publicity actually prejudiced any juror against appellant. The State and defense counsel questioned each prospective juror to discover whether prospective jurors had heard any media coverage about the case and whether they had formed any preconceived ideas about appellant's guilt. The court excused prospective jurors who appeared unable to set aside any outside information and to decide the case based solely upon the evidence presented at trial. Moreover, unless other cause existed, the court did not excuse jurors who stated that they could be fair and impartial and decide the case based

47

solely upon the evidence presented at trial. *Mammone*, 2014-Ohio-1942, at ¶ 71, quoting *Irvin*, 366 U.S. at 723 (a juror is unbiased "'if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court'"). "The trial court was in the best position to judge each juror's demeanor and ability to be fair and decide whether to credit the juror's assurance that [the juror] would set aside any prior knowledge and preconceived notions of guilt." *Grate*, 2020-Ohio-5584, at ¶ 59, citing *State v. Trimble*, 2009-Ohio-2961, ¶ 64; *see also Patton v. Yount,* 467 U.S. 1025, 1031 (1984), quoting *Irvin*, 366 U.S. at 723 (trial court's findings of juror impartiality may "be overturned only for 'manifest error'").

**{¶83}** We again note that appellant did not exercise all of his peremptory challenges. Had appellant thought that any of the jurors selected to hear the case actually harbored prejudice as a result of pretrial publicity, he could have exercised his remaining peremptory challenge. Appellant's failure to challenge the remaining jurors constitutes "strong evidence that

he was convinced the [other] jurors were not biased and had not formed any opinions as to his guilt." *Skilling*, 561 U.S. at 396, quoting *Beck v. Washington,* 369 U.S. 541, 557-558 (1962).

**{¶84}** Appellant further claims that "[e]very single person on the jury stated during voir dire that they knew information about the case from an outside source in some way." The record does not, however, contain a list of the 12 jurors who ultimately were seated. The verdict form contains the signature of all 12 jurors, but only 7 of those signatures are legible.

**{¶85}** Furthermore, the transcript of the final stage of the jury-selection process does not clearly identify the 12 jurors who ultimately were seated. Additionally, the record plainly shows that appellant exercised peremptory challenges to excuse three of the jurors who he claimed were seated as jurors: Ka., Th., and Mc. Thus, the record does not support appellant's implication that Ka., Th., and Mc. were seated as jurors. Moreover, without a list of all 12 jurors, this court cannot accurately evaluate appellant's assertion that all 12 jurors had heard about the case from an outside source. *See Ewert v.*

*Holzer Clinic, Inc.*, 2013-Ohio-5609, ¶ 18 (4th Dist.) (an appellant "has the burden of providing this court with a record of the facts, testimony, and evidentiary matters necessary to support [an] assignment of error").  Even if all 12 jurors had heard about the case from an outside source, however, having knowledge about the case does not equate to being prejudiced against a defendant.  *See, e.g., Thompson*, 2014-Ohio-4751, at ¶ 102 ("jurors need not be totally ignorant about the facts of a case").

**{¶86}**  We also observe that the record indicates that at least five of the prospective jurors did not have any pre-existing knowledge about the case: L., P., G., Am., and St.

**{¶87}**  L. stated that although she saw the "Justice for [K.R.]" signs, the signs did not make any impression on her because she was unaware that a murder had occurred until learning about it during voir dire.

**{¶88}**  P. stated that she did not know anything about the case.  She saw the "Justice for [K.R.]" signs but did not know what they meant.

{¶89}  G. likewise did not know anything about the case.  She saw the signs and thought that "people wanted to make sure [K.R.] got justice."  Until being called for jury duty, however, she did not know who K.R. was or that a person named K.R. had been murdered.

{¶90}  Am. also had not heard any information about the case. He saw the "Justice for [K.R.]" signs but did not know who K.R. was.

{¶91}  St. explained that she did not know anything about the case.  She saw the signs, but she did not know what they meant and did not know that a murder had occurred until she reported for jury duty.

{¶92}  Other prospective jurors had little knowledge about the case.  Ta. heard about the murder shortly after it happened but did not have any other knowledge about the case.  He saw the "Justice for [K.R.]" signs, and they did not cause him to form any preconceived notions.  He emphasized that "everybody is innocent until proven guilty."  Ta. recognized that the prevalence of the signs in the community suggested that K.R. had

an impact on the community.  He further stated, however, that knowing about K.R.'s community impact would not affect his ability to be impartial.

{¶93}  W. heard about the murder after it had occurred and also heard when a person had been arrested.  He saw the signs but indicated that he had become oblivious to them given the length of time.

{¶94}  Ha. knew little about the case.  He heard that a murder had occurred, and he later heard a news story when officers had arrested an individual.  Other than that, he did not know anything about the case and did not have an opinion whether appellant had "done something wrong."

{¶95}  Hy. knew that K.R. had been shot and that officers had arrested a suspect.  She did not know anything else about the case.  She saw the signs and thought that they were aimed at "awareness."

{¶96}  Ha.1 heard about a shooting on the news.  He saw the "Justice for [K.R.]" signs, but they did not cause him to form any impressions.

{¶97} Lu. had discussed the case "in passing."  He knew that a crime had occurred and that K.R. was the name of the victim. He later read in a news article that appellant is from Charleston.

{¶98}  Another prospective juror read news articles when they were published and recalled reading that K.R. had been murdered. She saw the signs and thought "that it was nice that people still care to have that out."  She believed that the signs intended to convey that the family will not forget about it and would like to have justice served.  This prospective juror felt that community pressure existed to obtain a conviction, but she stated that she did not feel pressure.  She further indicated that if the State did not prove its case beyond a reasonable doubt, she would not hesitate to find appellant not guilty.

{¶99}  In short, nothing in the voir dire testimony indicates that the jurors who remained displayed any conduct or made any comments to suggest that they actually were prejudiced against appellant.  Appellant thus has failed to establish "that actual

bias infected the jury that tried him." *Skilling*, 561 U.S. at 398.

## 3

### Racial Makeup

**{¶100}** Appellant also contends that he could not receive a fair trial in Meigs County due to a dearth of African American citizens and undercurrents of racism detected during voir dire.

**{¶101}** Although appellant does not cite authority to support this argument, we observe that "[t]he Sixth Amendment to the United States Constitution does not require that petit juries 'mirror the community and reflect the various distinctive groups in the population.'" *State v. Jackson*, 2005-Ohio-5981, ¶ 64, quoting *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975). Consequently, "[d]efendants are not entitled to a jury of any particular composition." *Taylor* at 538. The selection of jury panels must not, however, "systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Id.*

{¶102} In the case at bar, even if Meigs County is predominantly white, as appellant alleges, appellant has not shown that African Americans were systemically excluded. Furthermore, a lack of African Americans does not, on its own, "create a presumption that discrimination has occurred." *State v. Glenn*, 28 Ohio St.3d 451, 454 (1986) ("The mere fact that only one black appeared in the array of prospective jurors neither indicates that minorities were systematically excluded, nor does it create a presumption that discrimination has occurred.").

{¶103} Regarding appellant's claim that some prospective jurors expressed concerns about racism, we note that the record indicates that the trial court excused any jurors who displayed racist tendencies. Moreover, nothing indicates that "the entire jury pool was tainted simply because [some] prospective jurors made racist comments." *Graham*, 2020-Ohio-6700, at ¶ 47; *see also State v. Hairston*, 2007-Ohio-4159, ¶ 14 (4th Dist.) (appellant failed to establish that prospective jurors' racist comments "biased or prejudiced the empaneled jurors").

{¶104} Additionally, we again note that appellant did not exercise all of his peremptory challenges. His failure to do so suggests that he was satisfied with the empaneled jurors and did not harbor concerns that any of the empaneled jurors were racists.

{¶105} Accordingly, based upon the foregoing reasons, we overrule appellant's first assignment of error.

**C**

**Second Assignment of Error**

{¶106} In his second assignment of error, appellant argues that the trial court deprived him of his right to a fair and impartial jury under the Ohio and United States constitutions by removing for cause L.G., "the only African-American juror willing to sit" on the jury. Appellant contends that the court's explanation for dismissing L.G. was unreasonable and arbitrary. Appellant observes that the court stated that L.G. "probably has very strong feelings about the judicial system because of her brother," who is a convicted felon. Appellant asserts that the trial court did not "apply this principle

evenly across the entire jury venire." Appellant notes that
five days before dismissing L.G., the court allowed another
juror, O., to sit on the jury even though the juror's brother
also was a convicted felon. Appellant complains that the court
did not, however, express any misgivings about allowing O. to
sit on the jury. Appellant states that "[w]hen a court
dismisses one juror for a supposed deficiency but allows another
with the same deficiency to be seated, that is the definition of
arbitrary."

{¶107} Appellant also recognizes that the court (1) referred
to L.G.'s "obvious connection with people" who had relationships
with appellant or the victim and (2) pointed out that the victim
may have been in L.G.'s house. Appellant notes that the court
further stated that "[L.G.] may have seen [appellant] at one
point speaking with her friends." Appellant nevertheless
asserts that the juror's limited connections with the victim and
appellant were insufficient to show that she would not be fair
and impartial. Appellant observes that L.G. stated that she

could be fair and impartial.  Appellant thus claims that the trial court abused its discretion by dismissing her.

**{¶108}** The State contends that the trial court did not abuse its discretion by excusing L.G. for cause.  The State maintains that the trial court acted reasonably by dismissing the juror given her family's connection to the victim and her previous observation of appellant with a group of friends.  The State further argues that the trial court did not act arbitrarily. The State points out that the court had "dismissed dozens of prospective jurors who had less of a connection to the victim or [a]ppellant for any number of reasons, including particularly those who knew some about the case, knew the victim, worked with the victim's mother, or even who merely had a spouse who worked with the victim's mother."

**1**

**Standard of Review**

**{¶109}** A reviewing court will not disturb a trial court's ruling regarding a challenge for cause "'unless it is manifestly arbitrary and unsupported by substantial testimony, so as to

constitute an abuse of discretion.'" *State v. Jackson,* 2005-Ohio-5981, ¶ 38, quoting *State v. Williams,* 79 Ohio St.3d 1, 8 (1997); *accord State v. Thompson*, 2014-Ohio-4751, ¶ 83 (trial courts have discretion to determine whether a prospective juror should be disqualified for cause). Thus, reviewing courts will not reverse a trial court's decision regarding a challenge for cause unless the trial court abused its discretion. *State v. Madison*, 2020-Ohio-3735, ¶ 20 ("a trial court's resolution of a challenge for cause will be upheld unless it is unsupported by substantial testimony, so as to constitute an abuse of discretion").

**2**

**Challenges for Cause**

{¶110} Crim.R. 24(C) and R.C. 2945.25 contain a list of reasons for challenging a juror for cause. Crim.R. 24(C)(9) and R.C. 2945.25(B) allow a juror to be challenged for cause if the juror "is possessed of a state of mind evincing enmity or bias toward the defendant or the state." The rule and the statute further provide, however that "no person summoned as a juror

shall be disqualified by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused" if the examination of the juror or other evidence satisfies the court "that the juror will render an impartial verdict according to the law and the evidence submitted to the jury at the trial."  Crim.R. 24(C)(9); R.C. 2945.25(B).  Both the rule and the statute also contain catchall provisions that allow a juror to be challenged for cause if the juror is otherwise "unsuitable for any other cause to serve as a juror." Crim.R. 24(C)(14); R.C. 2945.25(O); *accord State v. Thompson*, 2014-Ohio-4751, ¶ 83.

**{¶111}** A trial court that is evaluating a challenge for cause should consider whether the juror can set aside any personal opinions and decide the case based solely on the evidence presented at trial.  *See State v. Madison*, 2020-Ohio-3735, ¶ 42. The court also must assess the juror's credibility and decide whether to believe any attestations of impartiality.  *See id.* Indeed, the trial court's duty is "to determine which statements of the prospective juror reflect that individual's true state of

mind and ability to follow the law." *State v. Williams*, 79 Ohio St.3d 1, 7-8 (1997). For this reason, a reviewing court generally must defer "'to the trial judge who sees and hears the juror.'" *Id.* at 8, quoting *Wainwright v. Witt,* 469 U.S. 412, 426 (1985).

**{¶112}** In the case at bar, we do not believe that the trial court abused its discretion by dismissing L.G. for cause. When explaining the rationale for dismissing L.G., the trial court cited L.G.'s connections to appellant and the victim. L.G. disclosed that her son and nephews were friends with the victim and that the victim had visited her home "quite a bit." L.G. further explained that she never met the victim because she was at work during the times that he had been visiting her home. The prosecutor asked L.G., given her son's and nephews' friendship with the victim, how they would react if she were selected for the jury and voted to acquit appellant. L.G. stated that she did not have any concerns that her family would react in a negative manner, as long as she "told the truth."

{¶113} L.G. also stated that she had seen appellant on a prior occasion, although she does not recall when she saw him. L.G. explained that she had been in a vehicle with some friends, and they stopped to talk to a group of people.  Appellant was in that group of people.  L.G. did not, however, speak to appellant.

{¶114} We recognize that "[w]hether a prospective juror knew the victim of an offense or had previously seen the accused is not, *per se,* a basis for dismissal for cause." *State v. Sheppard*, 84 Ohio St.3d 230, 235 (1998).  The trial court nevertheless reasonably could have concluded that L.G.'s connections raised questions about whether she would be fair and impartial, despite her attestations that she would.  Moreover, as the State notes, the court also had dismissed other prospective jurors who otherwise had tangential or direct relationships with the victim's family.

{¶115} In further explaining its decision to dismiss L.G., the court observed that the Meigs County Common Pleas Court had convicted L.G.'s brother of a felony and, at the time of voir

dire, he remained imprisoned.  L.G. denied that her brother's experience would cause her to feel prejudiced against the State or law enforcement.  She stated, "Right is right and wrong is wrong."  The trial court believed, however, that this previous experience with the judicial system might influence L.G.'s feelings.

{¶116} The court thus concluded that the foregoing collection of factors rendered L.G. unsuitable to serve impartially, despite her assurances to the contrary.  We again note that the trial court's duties are to assess the credibility of prospective jurors and to determine whether to believe a juror's statement that the juror will be fair and impartial.  The trial court judge actually saw and heard L.G.'s responses to questions and notably remarked that L.G. has known the judge "her whole life."  We, as a court reviewing a written record, thus are unable to conclude that the trial court abused its discretion by deciding to excuse L.G. for cause.

{¶117} Appellant also appears to suggest that the juror's race may have been a factor in the court's decision to excuse

her for cause.  Appellant states that L.G. was the only viable

African American prospective juror called in a predominantly

white county.  Nothing in the record indicates that the trial

court's decision to excuse L.G. was based on race, however.

Moreover, appellant specifically states that he does not ask

this court to review the court's dismissal of L.G. under *Batson

v. Kentucky*, 476 U.S. 79 (1986).[5]

{¶118} Additionally, even if we presume that the trial court

erred by excusing L.G., appellant has not shown how this alleged

error prejudiced him.  Crim.R. 52(A) provides:  "Any error,

defect, irregularity, or variance which does not affect

---

[5] "The Equal Protection Clause of the Fourteenth Amendment
to the United States Constitution prohibits purposeful
discrimination in the form of a prosecutor's use of a peremptory
challenge to excuse a prospective juror based on his or her race
or gender." *State v. Stalder*, 2023-Ohio-2359, ¶ 16.  "Under
*Batson*, once a prima facie case of discrimination has been shown
by a defendant, the State must provide race-neutral reasons for
its peremptory strikes.  The trial judge must determine whether
the prosecutor's stated reasons were the actual reasons or
instead were a pretext for discrimination." *Flowers v.
Mississippi*, 588 U.S. 284, 298 (2019).  However, "*Batson* applies
only to prospective jurors removed by peremptory challenge."
*State v. Adams*, 2015-Ohio-3954, ¶ 158.

substantial rights shall be disregarded." In other words, the error must have been prejudicial, i.e., it must have affected the outcome of the trial. *State v. Fisher,* 2003-Ohio-2761, ¶ 7.

**{¶119}** In the case sub judice, appellant has not explained how L.G.'s dismissal affected the outcome of the trial. Any argument that L.G. would have voted to acquit would be pure speculation. *See State v. Coonrod*, 2012-Ohio-6302, ¶ 31 (4th Dist.) (assertion that excused juror would have voted to acquit was speculative); *See State v. Brown*, 2012-Ohio-1848, ¶ 53 (2nd Dist.) (observing that appellant's claim that juror excused during deliberations was "likely favorable" to him was "wholly speculative"). Therefore, even if the trial court somehow erred when it excused L.G., appellant fails to demonstrate how the error is anything other than harmless error.

**{¶120}** Furthermore, appellant has not shown that the empaneled jury harbored any prejudice toward him or failed to be fair and impartial. We again observe that appellant waived his

final peremptory challenges and thus indicated his satisfaction with the empaneled jurors.

{¶121} Accordingly, based upon the foregoing reasons, we overrule appellant's second assignment of error.

**D**

**Third Assignment of Error**

{¶122} In his third assignment of error, appellant argues that the trial court deprived him of his due process right to a fair trial by allowing the victim's mother to wear, on the first day of individual voir dire, a shirt that read, "Justice for [K.R.]." Appellant contends that this shirt created an impression of guilt and prejudiced the jury against him. He asserts that the shirt served as a stark reminder of the community's sentiment and the victim's family's grief. Appellant claims that the mother's shirt could have influenced the jurors to sympathize with the victim's family and, consequently, to convict appellant based on emotion rather than evidence.

{¶123} Appellant submits that the presence of the shirt during voir dire was particularly prejudicial because it could have affected the jurors' ability to remain impartial before the trial even began. He states that one of the petit jurors saw the victim's mother wearing the shirt and that this juror "was no doubt affected by the shirt and sympathetic to [the victim's mother's] grief and desire for justice for her son." Appellant claims that "[j]urors decided [a]ppellant was guilty because they sympathized with the grieving mother wearing the Justice for [K.R.] t-shirt, not because of the evidence presented by [a]ppellee."

{¶124} The State does not agree that the shirt affected the jury's impartiality. The State maintains that nothing in the record suggests that the shirt had any actual impact on the jury's ability to remain fair and impartial. The State disputes appellant's assertion that the shirt affected the petit juror. The State observes that the juror "ultimately indicated he could be fair and impartial" and states that if the shirt had affected this juror to the extent that the juror "could not be fair and

67

impartial," then a reasonable belief is that the juror would have informed the court that he could not be fair and impartial, like "many others had." The State further contends that the victim's mother's shirt "in no way urged jurors to assuage [her] grief with a conviction" and notes that the victim's parents ultimately agreed not to wear the shirts during trial.

**{¶125}** We first observe that "[t]he impact of emotional outbursts at trial by witnesses or spectators cannot be judged by an appellate court on a cold record." Whether the jury was "'disturbed, alarmed, shocked or deeply moved'" are questions that "'necessarily depend on facts which no record can reflect.'" *State v. Hill*, 75 Ohio St.3d 195, 204 (1996), quoting *State v. Bradley*, 3 Ohio St.2d 38, 40 (1965). For this reason, whether a murder trial spectator's conduct, which may include emotional outbursts, improperly influenced the jury against the defendant "'so as to deprive the accused of a fair trial [is a question] of fact to be resolved by the trial court.'" *State v. Clinton*, 2017-Ohio-9423, ¶ 220, quoting *Bradley,* 3 Ohio St.2d 38, at syllabus. Thus, reviewing courts

68

should not disturb the trial court's factual finding "'in the absence of evidence contrary to that determination clearly and affirmatively appearing on the face of the record.'" *Id.*, quoting *Bradley,* 3 Ohio St.2d 38 at syllabus.

{¶126} In *Clinton*, 2017-Ohio-9423, for example, the court determined that a murder victim's brother's emotional showing during individual voir dire did not deprive the defendant of a fair trial.  In that case, the defendant stood charged with multiple offenses, including the aggravated murders of a young mother and her two young children.  During individual voir dire, the murdered mother's brother was glaring at the defendant and wearing a shirt that listed the victims' names.  The trial court advised the brother and other family members who had been wearing the shirt that they could not wear them while in the courtroom.  Rather than forcing the family members to leave for the day, the court stated that they could wear the shirts inside out.

{¶127} The defendant's counsel also asked the trial court to instruct the brother not to glare at the defendant while the

69

jurors were present.  The trial court indicated that it had spoken to the brother and asked him to refrain from glaring at the defendant.

{¶128} Later that day, the defendant's counsel pointed out that, when the trial court informed the family members that they could not wear the shirt, the brother "literally stood up in the courtroom and took off the shirt and turned it inside-out and put it back on."  *Id.* at ¶ 216.  The defendant's counsel further stated that when the brother started glaring at the defendant, the defendant stated, "'I don't want to be in here.  I don't want to be subjected to this.'"  *Id.*

{¶129} After his conviction, the defendant appealed and argued, in part, that the trial court erred by failing to hold a hearing to determine whether the brother's conduct caused any of the jurors to be biased against him.  The defendant claimed that one of the prospective jurors, while being questioned, had witnessed the brother's conduct and later was seated as a petit juror.  *Id.* at ¶ 219.

{¶130} The Ohio Supreme Court did not agree with the defendant. The court noted that the "brother's behavior occurred during voir dire" and that "the trial court took corrective action to ensure" that the brother's behavior did not continue. *Id.* at ¶ 221. The court also observed that the defendant's counsel failed to challenge the prospective juror who was present in the courtroom during the brother's conduct and who later was seated on the jury; and the defendant's counsel did not challenge any other juror who may have witnessed the brother's conduct. *Id.* The court stated that the defendant's failure to challenge these jurors "indicate[d] that the defense was satisfied with the trial court's corrective action." *Id.*

{¶131} The court additionally recognized that the brother's conduct occurred during voir dire—i.e., before a jury was empaneled—and that the record did not indicate whether the prospective juror who had been seated as a petit juror had even observed the brother's behavior. *Id.* at ¶ 225. The court thus

found that "it would be speculative to conclude that [the defendant] was denied a fair trial." *Id.*

{¶132} Similarly, in the case at bar, the record shows that the victim's mother wore the shirt during the first day of individual voir dire. After the parties finished questioning the third prospective juror, appellant objected to the mother's shirt. The trial court initially overruled his objection. After examining two other prospective jurors, the court advised the victim's parents that they should not wear the shirts. The record does not indicate whether the mother immediately complied, but it also does not indicate that the mother failed to abide by the trial court's request. Thus, the record suggests that the mother wore the shirt, at most, only during the first day of individual voir dire.

{¶133} Although appellant claims that a petit juror saw the shirt and that it had influenced him, we observe that during voir dire, when the prosecutor asked the juror whether he had seen any "Justice for [K.R.]" shirts, the juror stated that he had not noticed any. Appellant's counsel also questioned this

juror and did not ask him any questions regarding the victim's mother wearing the shirt or if seeing her wearing the shirt would influence his decision.  Instead, appellant's counsel asked this juror if he would have "any reservation in reaching a not guilty verdict if the State failed to meet its burden of proof in this case."  The juror responded that if he believed that "the State did not prove beyond a shadow of a doubt," then he would "say not guilty."  The juror stated that he would not have any worries about "community sentiment."

{¶134} After the parties had finished questioning this juror, neither one asked the court to excuse the juror for cause. Furthermore, if this juror was in fact one of the petit jurors,[6] appellant could have chosen to exercise his remaining peremptory challenge to excuse the juror if he believed that the victim's mother's shirt had influenced the juror.

{¶135} Moreover, appellant's reliance on *State v. Montgomery,* 2022-Ohio-2211, is misplaced.  In that case, before trial, the

---

[6] As we noted earlier, the record does not contain a list of the petit jurors.

trial court introduced the victim as the state's representative. And, during trial, the court permitted the victim to sit at the prosecutor's table. The error in *Montgomery* thus occurred during the trial, not during individual voir dire. In *Montgomery*, every petit juror had witnessed the victim seated at the prosecution's table. In the case at bar, by contrast, appellant has not pointed to anything in the record to establish that any petit jurors saw the victim's mother wearing the shirt. Indeed, one of the jurors stated that he had not seen any "Justice for [K.R.]" shirts at all–not even the mother's shirt– even though the mother had been wearing the shirt during this particular juror's individual voir dire questioning.

{¶136} Accordingly, based upon the foregoing reasons, we overrule appellant's third assignment of error.

## II

### Fourth Assignment of Error

{¶137} In his fourth assignment of error, appellant asserts that the trial court violated his Fifth Amendment privilege against self-incrimination by allowing the State to introduce

evidence that allegedly improperly commented on his pre-arrest and post-arrest silence.  Appellant cites three instances when the State allegedly improperly commented on his pre-arrest right to remain silent:  (1) during opening statement, the prosecutor referred to appellant's declaration-made to police officers while hospitalized in Charleston, West Virginia, as a purported victim of a shooting-that he did not want to cooperate with law enforcement officers who were investigating the cause of appellant's gunshot wound; (2) Ohio Bureau of Criminal Investigation Special Agent Jonathan Jenkins testified that appellant did not want to cooperate with the Charleston officers who were investigating the cause of his gunshot wound; and (3) Meigs County Sheriff's Deputy Joe Barnhart testified that appellant did not appear for a meeting that officers had arranged.

**{¶138}** Appellant cites one instance when the State introduced testimony that allegedly improperly commented on his post-arrest right to remain silent:  Deputy Spiker testified that he retrieved appellant from jail and reminded appellant that his

*Miranda* rights still applied.  Appellant asserts that because Deputy "Spiker reported no further statements by [appellant], the jury was left with the impression that [appellant] refused to waive his constitutional rights and must have had something to hide."

{¶139} The State contends that neither its opening statement's reference to appellant's assertion made while hospitalized nor Agent Jenkins's testimony regarding that assertion violated appellant's privilege against self-incrimination.  The State submits that when the Charleston police spoke with appellant while he was hospitalized, appellant's Fifth Amendment privilege against self-incrimination had not yet attached.  The State observes that the Charleston police spoke with appellant as a purported victim of a shooting, not as a suspect in the victim's murder.  The State contends that because the officers did not speak with appellant as a criminal suspect, appellant was not entitled to *Miranda* warnings or to protection from the self-incrimination privilege.  The State thus argues that it did not violate appellant's privilege

against self-incrimination by (1) referring, in its opening statement, to appellant's statement that he did not wish to cooperate with the Charleston police or (2) eliciting Agent Jenkins's testimony that appellant stated that he did not want to cooperate with the officers who were investigating appellant's shooting.

**{¶140}** The State also disputes appellant's argument that Deputy Barnhart's testimony that a scheduled meeting with appellant did not occur violated appellant's privilege against self-incrimination.  The State asserts that Deputy Barnhart's testimony simply explained officers' investigative steps and did not improperly comment on appellant's privilege against self-incrimination.  The State thus contends that it did not use the deputy's statement as substantive evidence.

**{¶141}** The State further argues that the deputy's statement did not necessarily indicate that appellant had failed to appear or canceled the meeting; instead, the deputy stated that the meeting "did not ever happen."  The State also observes that the trial court sustained appellant's objection to Deputy Barnhart's

testimony and gave the jury a curative instruction.  The State

contends, however, that rather than sustaining appellant's

objection and instructing the jury to disregard the testimony,

the court should have concluded that the deputy's testimony

simply described "the course of his investigation, which is

permissible testimony."

**{¶142}** The State additionally disputes appellant's assertion

that Deputy Spiker's testimony that he re-advised appellant of

his *Miranda* rights violated appellant's privilege against self-

incrimination.

**A**

**Privilege Against Self Incrimination**

**{¶143}** The Fifth Amendment provides that no person "shall be

compelled in any criminal case to be a witness against himself."[7]

"The privilege against self-incrimination . . . is a fundamental

trial right of criminal defendants."  *United States v. Verdugo-*

---

[7] The self-incrimination clause of the Fifth Amendment
applies to the states via the Fourteenth Amendment.  *Malloy v.
Hogan*, 378 U.S. 1, 6 (1964).

*Urquidez*, 494 U.S. 259, 264 (1990).  The privilege protects a person from (1) "being involuntarily called as a witness against himself in a criminal prosecution" and (2) "answer[ing] official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings."  *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973); *accord Vega v. Tekoh*, 597 U.S. 134, 141 (2022)*; State v. Gideon*, 2020-Ohio-6961, ¶ 8.  The Fifth Amendment also "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt."  (Footnote omitted.)  *Griffin v. California*, 380 U.S. 609, 615 (1965).  "The object of the Amendment is " 'to insure that a person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show that he himself had committed a crime.' "  *Lefkowitz*, 414 U.S. at 77, quoting *Counselman v. Hitchcock*, 142 U.S. 547, 562 (1892).

{¶144} A person does not, however, have an " '"absolute right to invoke the Fifth Amendment." ' "  *State v. Arnold*, 2016-Ohio-

1595, ¶ 43, quoting *State v. Arnold*, 2014-Ohio-1134, ¶ 22 (3d Dist.), quoting *In re High Fructose Corn Syrup Antitrust Litigation*, 293 F.Supp.2d 854, 859 (C.D.Ill.2003).  Instead, the privilege against self-incrimination is limited "to instances where the witness has reasonable cause to apprehend danger from a direct answer."  *Hoffman v. United States*, 341 U.S. 479, 486 (1951); *accord Ohio v. Reiner*, 532 U.S. 17, 20-21 (2001); *see also Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cty.*, 542 U.S. 177, 189 (2004) ("To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled."); *see generally Davis v. Washington*, 547 U.S. 813, 832 (2006) (recognizing that a witness's statement given to officers who were making initial inquiries at an alleged crime scene may be testimonial for purposes of the Confrontation Clause).  A witness has reasonable cause to apprehend danger from a direct answer when "the implications of the question, in the setting in which it is asked, [manifest] that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous

because injurious disclosure could result." *Hoffman*, 341 U.S. at 486–87.

**{¶145}** In order to safeguard a suspect's Fifth Amendment privilege against self-incrimination, law enforcement officers seeking to perform a custodial interrogation first must warn the suspect "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). If a person, after receiving *Miranda* warnings, invokes the right to remain silent, the State may not, as a matter of fundamental fairness under the Due Process Clause, use the person's silence as evidence of guilt. *See Wainwright v. Greenfield*, 474 U.S. 284, 292 (1986) ("[I]t is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony."); *Doyle v. Ohio*, 426 U.S. 610, 619 (1976) ("[T]he use for impeachment

purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment."); *compare Jenkins v. Anderson*, 447 U.S. 231, 240 (1980) (impeaching defendant by using evidence of his pre-arrest, pre-*Miranda* silence was not fundamentally unfair and did not violate due process under the Fourteenth Amendment when "no governmental action induced petitioner to remain silent").

**{¶146}** Moreover, the Ohio Supreme Court held that the State may not use evidence of an accused's pre-arrest, pre-*Miranda* silence as substantive evidence of guilt. *See State v. Leach*, 2004-Ohio-2147, ¶ 37. In *Leach*, a law enforcement officer testified that he called the defendant to inform him that one of the alleged victims indicated that the defendant wished to speak with police. The defendant advised the officer that he would meet the officer later that same day. The defendant, however, did not keep the appointment. Instead, the defendant called the officer's phone number and left a message that he wished to speak with an attorney before talking to the police.

{¶147} The Ohio Supreme Court determined that allowing the officer to testify that the defendant had invoked his right to an attorney violated "the policies behind the Fifth Amendment." *Id.* at ¶ 30. In doing so, the court noted that the United States Supreme Court had not yet considered whether admitting evidence of an accused's pre-arrest, pre-*Miranda* silence violates the Fifth Amendment. The court thus looked to the federal appellate courts for guidance. The court found a Sixth Circuit case, *Combs v. Coyle*, 205 F.3d 269, 272 (6th Cir. 2000), "[m]ost relevant." In *Combs*, the appellate court concluded that using the defendant's statement that he made to an officer at the crime scene (i.e., "[t]alk to my lawyer") as substantive evidence of his guilt violated his privilege against self-incrimination.

{¶148} Ten years after *Leach*, however, the Sixth Circuit recognized that, since its *Combs* decision, the United States Supreme Court ruled in *Salinas v. Texas*, 570 U.S. 178, 183 (2013) (plurality opinion), that "prosecutors may use a defendant's pre-arrest silence as substantive evidence of his

guilt if the defendant did not expressly invoke his right to remain silent." *Abby v. Howe*, 742 F.3d 221, 228, (6th Cir. 2014), citing *Salinas* at 183. The *Abby* court thus concluded that because the defendant had not invoked his right to remain silent, "the prosecutor's comments regarding [the defendant]'s pre-arrest silence would be permissible under *Salinas*." *Id.*

{¶149} In *Salinas*, the defendant claimed that introducing evidence of his pre-arrest silence violated his privilege against self-incrimination. In that case, the prosecutor introduced evidence that the defendant, during a non-custodial interview, had refused to answer questions posed by officers who were investigating a murder with which the defendant later was charged. A three-justice plurality concluded that the defendant could not assert that using his pre-arrest silence violated his privilege against self-incrimination because he had failed to invoke the privilege during the police interview.

{¶150} Some Ohio appellate courts since have concluded that *Salinas* allows the State to use a defendant's pre-arrest, pre-*Miranda* silence as substantive evidence of guilt without

84

violating the privilege against self-incrimination, "if the defendant fails to expressly invoke the privilege."  *State v. Speis*, 2023-Ohio-1422, ¶ 17 (12th Dist. ), citing *Salinas*; *accord State v. Bender*, 2024-Ohio-1750, ¶ 48 (3d Dist.); *see also State v. Lowery*, 2023-Ohio-4444, ¶ 14 (2nd Dist.), quoting *Salinas*, 570 U.S. at 189 ("'[P]opular misconceptions notwithstanding, the Fifth Amendment guarantees that no one may be 'compelled in any criminal case to be a witness against himself'; it does not establish an unqualified 'right to remain silent.'  A witness' constitutional right to refuse to answer questions depends on his reasons for doing so, and courts need to know those reasons to evaluate the merits of a Fifth Amendment claim.'").

**{¶151}** In the case at bar, we need not decide whether *Salinas* governs and allowed the State to comment upon and introduce evidence regarding appellant's pre-arrest, pre-*Miranda* silence in the absence of an express invocation of his privilege against

self-incrimination.[8]  Instead, we presume "that prosecutorial

comment on the defendant's pre-custodial silence violates the

Fifth Amendment."  *United States v. Zarauskas*, 814 F.3d 509,

515-16, (1st Cir. 2016); *see State v. Slusarczyk*, 2024-Ohio-

4790, ¶ 31 (8th Dist.) (testimony that, before his arrest, the

defendant "voluntarily came into the police station, began to

fill out a general statement form, crumpled up the form, and

then left" violated the defendant's privilege against self-

incrimination); *State v. Pence*, 2013-Ohio-1388, ¶ 17 (12th

Dist.) (introducing testimony violated the defendant's privilege

against self-incrimination when detective testified that, before

the defendant had been arrested or given *Miranda* warnings, the

defendant's attorney, not the defendant, returned a phone call

placed to the defendant, and the defendant never gave officers a

statement); *State v. Trusty*, 2013-Ohio-3548, ¶ 19 and 24 (1st

Dist.) (the State's substantive use of the defendant's pre-

_____

[8] Moreover, we observe that the Ohio Supreme Court has not
overruled *Leach*.

arrest, pre-*Miranda* silence violated the defendant's privilege against self-incrimination; the State introduced testimony during its case-in-chief that, after an officer contacted the defendant to request an interview, an attorney contacted the officer to notify the officer that the defendant "was going to exercise his constitutional right to remain silent"); *State v. Estepp*, 2007-Ohio-2596, ¶ 32 (2d Dist.) (detective's testimony that defendant failed to return phone calls and cancelled police interviews violated defendant's right not to incriminate himself). *But see State v. Register*, 2025-Ohio-106, ¶ 40 (8th Dist.) (testimony that the defendant volunteered, but failed, to bring police officers a written statement and photographs depicting sexual conduct between a mother and her son did not violate the defendant's privilege against self-incrimination when testimony concerned the defendant's actions before "being accused or charged with a crime"). The question then becomes whether the error merits reversal. *Zarauskas*, 814 F.3d at 516; *see also Neder v. United States*, 527 U.S. 1, 18 (1999), quoting R. Traynor, *The Riddle of Harmless Error* 50 (1970) ("'Reversal

for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it.'").

**B**

**Pre-arrest Silence**

**1**

**Appellant's Statement That He Did Not Want to Cooperate**

**{¶152}** During the State's opening statement, the prosecutor stated, "They had a person claiming to be a victim of a shooting, but that person did not want to cooperate, so there was nothing else for them to do." Although appellant did not contemporaneously object during the State's opening statement, after the prosecutor completed his opening statement, appellant requested a mistrial and asserted that the prosecutor improperly commented on appellant's "right to remain silent and to not cooperate with the police while he was at the hospital in Charleston, West Virginia." The State argued that nothing prohibited it from stating that appellant did not want to cooperate with the officers who had questioned him not as a

criminal suspect but as an alleged crime victim.  The trial court did not immediately rule on appellant's motion for a mistrial and instead delayed ruling on it until the next day to allow the court sufficient time to research the issue.

**{¶153}** The next day, the trial court overruled appellant's motion for a mistrial.  The court cautioned the State, however, not to mention appellant's "lack of cooperation with any law enforcement in regards to this case, unless or until he takes the stand."  After defense counsel finished his opening statement, the trial court also instructed the jury that appellant "has the absolute right not to be forced to testify against himself" and that "[i]f he elects not to testify at trial, his silence cannot be used against him in any attempt to prove his [guilt]."

**{¶154}** Agent Jenkins testified that an individual, later identified as appellant, had presented to the Charleston Area Medical Center with a gunshot wound to his upper right arm. Agent Jenkins indicated that this individual "gave a fake name and . . . didn't want to . . . be interviewed."  At that point,

the prosecutor interjected that he was "going to stop [the testimony] right there."  The prosecutor asked the court for permission to approach the bench, but the record does not contain any information about what the parties may have discussed at the bench.  The trial transcript indicates that the prosecutor next asked the agent to explain any other information gathered from appellant's hospital stay.

**{¶155}** Appellant did not contemporaneously object to the prosecutor's comment during opening statement or to Agent's Jenkins's testimony.  We thus review these two alleged errors for plain error.

**{¶156}** We again note that appellate courts have discretion to consider "[p]lain errors or defects affecting substantial rights."  Crim.R. 52(B); *e.g.*, *State v. Jones*, 2020-Ohio-3051, ¶ 17, quoting *State v. Rogers*, 2015-Ohio-2459, ¶ 23 ("An appellate court has discretion to notice plain error and therefore 'is not required to correct it.'").  A party asserting plain error must demonstrate the following:  (1) an error occurred; (2) the error was obvious; and (3) a reasonable probability that the error

90

affected the outcome of the proceeding.  *State v. Echols*, 2024-Ohio-5088, ¶ 50.

{¶157} In the case at bar, even if the prosecutor's comment was an obvious error, any error did not affect the outcome of the proceedings.  First, as indicated above, defense counsel moved for a mistrial based upon the prosecutor's comment, and the trial court later gave the jury a curative instruction to inform the jurors that appellant's silence could not be used to prove his guilt.  Additionally, the prosecutor's comment was a brief reference to appellant's statement that he did not want to cooperate with the Charleston police and did not suggest that appellant's statement indicated his guilt.  *See generally State v. Treesh*, 90 Ohio St.3d 460, 480 (2001), citing *Meeks v. Havener*, 545 F.2d 9, 10  (6th Cir. 1976) ("A single comment by a police officer as to a suspect's silence without any suggestion that the jury infer guilt from the silence constitutes harmless error."); *Meeks* at 10 (an officer's statement that the defendant informed the officer that "he would not care to speak of this case" constituted harmless error when neither the officer nor

the prosecution, during closing argument, used the defendant's comment "to suggest that the jury draw an implication of guilt from silence"). Moreover, as we explain in our discussion of appellant's sixth assignment of error, the record otherwise contains overwhelming evidence to support appellant's conviction. Thus, even absent the prosecutor's comment, the result of the trial would not have been different.

{¶158} Likewise, even if Agent Jenkins's testimony was an obvious error, any error did not affect the outcome of the proceedings. The agent's testimony was a brief reference to appellant's statement that he did not want to cooperate with the Charleston police and did not suggest that appellant's statement indicated his guilt. *See generally Treesh*; *Meeks* at 10. Furthermore, nothing indicates that the result of the trial would have been different if Agent Jenkins had not testified that appellant did not wish to be interviewed.

{¶159} Consequently, we do not agree with appellant that any error that may have occurred requires a reversal.

**2**

**Deputy Barnhart's Testimony**

**{¶160}** When responding to the prosecutor's question about investigative steps, Deputy Barnhart stated that "we had set a meeting for [appellant] to come in and talk to us.  Um, which did not ever happen."  Appellant objected, and the trial court sustained the objection.  The court also instructed the jury "to disregard any statement made by anybody, law enforcement, witness, or anybody else, about, us, where or not [appellant], uh, took part in the investigation."  The court advised the jury that appellant "had the absolutely [sic] right to remain silent and in no way make any statements to law enforcement" and instructed the jury "to disregard that statement for any purpose."

**{¶161}** Because appellant objected when Deputy Barnhart testified that a meeting that officers had arranged with appellant did not occur, we review this claimed error for harmless error.  *See Neder v. United States*, 527 U.S. 1, 18 (1999) ("The erroneous admission of evidence in violation of the Fifth Amendment's guarantee against self-incrimination . . .

[is] subject to harmless-error analysis."); *State v. Powell*, 2012-Ohio-2577, ¶ 162 (a violation of a defendant's privilege against self-incrimination is subject to harmless-error review). An error is harmless if the record demonstrates "beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error[.]" *Neder v*, 527 U.S. at 18; *id.* at 19, quoting *Chapman v. California*, 386 U.S. 18, 22 (1967) (harmless errors are "'small errors or defects that have little, if any, likelihood of having changed the result of the trial'"); *State v. Smith*, 49 Ohio St.3d 137, 143 (1990) ("Unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required"); *see also* Crim.R. 52(A) ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."); *State v. Graham*, 2020-Ohio-6700, ¶ 55 (under the harmless-error standard, "the state bears the burden of demonstrating that the error did not affect the substantial rights of the defendant").

{¶162} The State's use of a defendant's pre-arrest silence constitutes harmless error when any comments were not extensive, the State did not emphasize that the defendant's pre-arrest silence constituted evidence of guilt, and the evidence otherwise overwhelmingly establishes the defendant's guilt. *See State v. Wiley*, 2022-Ohio-2131, ¶ 46 (8th Dist.) (the State's use of the defendant's pre-arrest silence was harmless error when "the prosecutor's questions were not extensive, the state did not stress to the jury that [the defendant]'s prearrest silence demonstrated guilt, and there was other overwhelming evidence of [the defendant]'s guilt, including [the defendant]'s admissions that he shot [the victim] in the back as he ran away, he is a drug dealer, and all of the items the police found in his backpack, including the gun, were his"); *see also State v. Powell*, 2012-Ohio-2577, ¶ 162 (improper comment on a defendant's privilege against self-incrimination constitutes harmless error when the "improper comments were brief and isolated"). Conversely, the State's use of a defendant's pre-arrest silence constitutes reversible error when the State's case against the

defendant "contain[s] no physical evidence and rest[s] solely on the credibility of the state's witnesses."  *Leach*, 2004-Ohio-2147, at ¶ 29.

**{¶163}** In the case at bar, we believe that Deputy Barnhart's testimony that a scheduled meeting with appellant did not occur constituted harmless error.  First, we observe that the deputy's testimony does not indicate why the meeting did not occur, and thus, whether the testimony actually comments on appellant's privilege against self-incrimination is questionable.  Even if the deputy's testimony was, however, an improper comment on appellant's privilege against self-incrimination, that comment was not specific or direct, meaning that the deputy did not state that the officers had scheduled a meeting with appellant and that he failed to appear.  Furthermore, even if the jury inferred that the meeting did not occur because appellant failed to appear, we observe that, after the deputy testified that the meeting did not occur, appellant objected, and the trial court instructed the jury to disregard the testimony.  *See Powell*, 2012-Ohio-2577, at ¶ 162 (prosecutor's improper comment on the

defendant's privilege against self-incrimination constituted harmless error when, inter alia, "the trial court immediately sustained a defense objection to the prosecutor's argument and ordered the jury to disregard it"). We presume that the jury followed the court's curative instruction. *See State v. Loza*, 71 Ohio St.3d 61, 75 (1994); *State v. Zuern*, 32 Ohio St.3d 56, 61 (1987). We also note that neither the State's opening statement nor closing argument commented upon the meeting's nonoccurrence or suggested that the nonoccurrence was indicative of appellant's guilt. Additionally, as we explain in our discussion of appellant's sixth assignment of error, the evidence of appellant's guilt otherwise is overwhelming. Therefore, the record establishes beyond a reasonable doubt that a rational jury would have found appellant guilty even without the deputy's statement that a scheduled meeting did not occur.[9]

---

[9] We note that the State contends that the trial court should have allowed the testimony as testimony regarding the course of the officers' investigation. *See Leach*, 2004-Ohio-2147, at ¶ 32. Given our discussion above, however, we do not address this argument.

## C

### Post-arrest Silence

{¶164} Deputy Spiker testified that he retrieved appellant from jail and drove him to the hospital for medical attention. The deputy indicated that appellant had a "bullet [that] had begun working itself out of the arm." The deputy stated that during his interaction with appellant, the deputy advised appellant that "his *Miranda* Rights . . . still apply and that anything that he said could be used against him in [c]ourt." After this statement, the prosecutor asked the deputy to identify a photograph that depicted appellant's right arm with "a bullet projectile type sticking out of the skin about halfway." Appellant claims that the absence of testimony between the deputy's response and the State's next question suggested to the jury that appellant exercised his right to remain silent after receiving *Miranda* warnings.

{¶165} The prosecution's use of a defendant's post-arrest, post-*Miranda* silence to impeach the defendant or as substantive evidence of the defendant's guilt violates a defendant's due

process rights. *See Vega v. Tekoh*, 597 U.S. 134, 146–47 (2022); *Wainwright v. Greenfield,* 474 U.S. 284, 291 (1986); *Doyle v. Ohio*, 426 U.S. 610, 617–619 (1976). The rationale for this rule is based upon the prophylactic rule set forth in *Miranda* that informs a defendant that the defendant has the right to remain silent and the right to an attorney. Using a defendant's post-*Miranda* silence would be contrary to the *Miranda* warnings and allow the State to take advantage of a defendant who chooses to remain silent when the *Miranda* warnings specifically gave the defendant the right to do so. *See Wainwright* at 291 ("breaching the implied assurance of the *Miranda* warnings is an affront to the fundamental fairness that the Due Process Clause requires"); *Doyle* at 618 (although "the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings").

**{¶166}** In the case at bar, Deputy Spiker's testimony did not improperly comment on appellant's decision to remain silent after the deputy re-advised appellant of his *Miranda* rights. After the deputy stated that he re-advised appellant of his

99

*Miranda* rights, the deputy did not state that appellant then chose to remain silent. Instead, the prosecutor changed the line of questioning and asked the deputy to identify some photographs that depicted the bullet protruding from appellant's arm. Thus, the State did not use appellant's post-arrest, post-*Miranda* silence as substantive evidence of the defendant's guilt.

**{¶167}** Even if the deputy's testimony suggested that appellant remained silent and thus constituted an improper comment, we note that appellant did not contemporaneously object to the deputy's testimony. Appellant's failure to object at a time when the trial court could have corrected any error means that he forfeited all but plain error for purposes of appeal. Nothing in the record suggests that the outcome of the trial would have been different if Deputy Spiker had not stated that he re-advised appellant of his *Miranda* rights. Moreover, the record does not establish that the case at bar is one of the rare cases in which failing to recognize the alleged error would result in a manifest miscarriage of justice.

{¶168} Accordingly, based upon the foregoing reasons, we overrule appellant's fourth assignment of error.

### III

### Fifth Assignment of Error

{¶169} In his fifth assignment of error, appellant argues that the trial court deprived him of due process and a fair trial by allowing the State to introduce allegedly improper victim-impact evidence.  Appellant asserts that this evidence started during the prosecution's opening statement, when the prosecutor stated the following:

> [The victim] was a young man who was only twenty five (25) years old, um, he was in the prime of his life.  He graduated from Wahama High School.  He excelled in football there and that helped him continue with his education at the University of Charleston, where he played football and graduated with a degree in Business Marketing.  He lived here in Pomeroy at 108 Legion Terrace.  Uh, he was working with his father and his concrete business, and his plan one day was to take over that concrete business from his father once his father retired.

{¶170} Appellant contends that the victim-impact evidence continued during Agent Jenkins's testimony, when he stated that the victim was "tough" and had the "will to live."  Agent

Jenkins further testified that the victim was "very well-liked" in the community, and an "all-star athlete, uh, just one of those guys that everyone liked, everybody wanted to know, everybody wanted to be around."

**{¶171}** Appellant asserts that neither the prosecution's opening statement nor Agent Jenkins's testimony was "relevant to any of the issues before the jury."  Instead, appellant contends that the information served to remind the jury that the victim "was a good person," his death was tragic, and his family wanted justice.  Appellant claims that the prosecution's opening statement and Agent Jenkins's testimony made the jury biased against him and made "it unlikely that they could fairly consider whether [appellant] was actually guilty."  Appellant contends that the "evidence was substantially outweighed by unfair prejudice under Evid.R. 403(A), and should have been excluded."

**{¶172}** Appellant further observes that his trial counsel did not object to the prosecution's opening statement or to Agent Jenkins's testimony.  He nevertheless asks this court to review

this assignment of error for plain error or to consider whether trial counsel provided ineffective assistance of counsel by failing to object.

{¶173} The State does not agree that it presented improper victim-impact evidence.  The State first asserts that its opening statement was not evidence and that it offered relevant information regarding the victim to provide background about the case, not to impermissibly appeal to the jury's emotions.  The State contends that the opening statement simply offered personal characteristics of the victim and did not comment on any emotional impact on the victim's family.

{¶174} The State further argues that its opening statement "did not serve to remind the jury what a good person the victim was, how tragic it was that he died, or how the victim's parents wanted justice."  The State asserts that its opening statement did not "seek to direct the jury away from the facts of the case and towards feelings of sympathy to the victim's family and anger towards Appellant."  The State also disagrees with appellant that the trial court should have excluded the comments

made during opening statement. The State again asserts that opening statements are not evidence and that Evid.R. 403(A) thus does not apply to opening statements.

**{¶175}** The State additionally disputes appellant's argument that Agent Jenkins's testimony contained improper victim-impact evidence. The State contends that the agent's testimony did not relate to the emotional impact of the crime on the victim's family. The State argues that Agent Jenkins's testimony was relevant to show the victim's path from his home to his neighbor's home and to illustrate the investigative steps law enforcement officers took to try to identify a suspect who may have had a motive for the murder. The State asserts that the agent's testimony "did not seek to direct the jury away from the facts of the case and towards feelings of sympathy to the victim's family and anger towards [a]ppellant."

**A**

**Standard of Review**

**{¶176}** We first observe that appellant failed to contemporaneously object to the prosecutor's opening statement

and to Agent Jenkins's testimony.  He therefore forfeited all but plain error for purposes of appeal.  We again observe that to establish that plain error occurred, appellant must show that "an error occurred, that the error was obvious, and that there is 'a reasonable probability that the error resulted in prejudice,' meaning that the error affected the outcome of the trial."  *State v. McAlpin*, 2022-Ohio-1567, ¶ 66, quoting *State v. Rogers*, 2015-Ohio-2459, ¶ 22.  As we explain below, we do not believe that the trial court erred by allowing improper victim-impact testimony.  Furthermore, even if the trial court obviously erred by allowing improper victim-impact evidence, the error did not affect the outcome of the trial.

**B**

**Victim-impact Evidence**

{¶177} "Victim-impact evidence includes evidence relating to the victim's personal characteristics and the impact that the crimes had on the victim's family."  *State v. Graham*, 2020-Ohio-6700, ¶ 113; *accord McAlpin* at ¶ 113.  "Victim-impact testimony is admissible during the guilt phase of the proceedings only

when it is relevant to the commission of the offense and it is not overly emotional." *Graham* at ¶ 136; *accord State v. Gross*, 2002-Ohio-5524, ¶ 62 (victim-impact testimony is relevant and admissible during the guilt phase of a death-penalty trial when the testimony concerns the circumstances surrounding the commission of the murder); *State v. Beuke*, 38 Ohio St.3d 29, 40 (1988) ("victim-background evidence may be relevant to establishing facts of consequence or otherwise necessary to prove an element of the crime"); *see also State v. Fautenberry*, 72 Ohio St.3d 435, 440 (1995) ("[e]vidence relating to the facts attendant to the offense, however, is clearly admissible during the guilt phase."); Evid.R. 401 (defining relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence").

**{¶178}** "Testimony is overly emotional when it is likely to inflame the passions of the jurors and elicit a purely emotional response that would inhibit the jurors from making an objective

and rational determination regarding the defendant's guilt and/or the appropriate punishment." *Graham*, 2020-Ohio-6700, at ¶ 123. Courts that are deciding whether testimony is overly emotional may consider the following factors: (1) "'the length of the victim-impact testimony'"; (2) "'whether witnesses, jurors, and audience members showed physical signs of emotion during the testimony'"; (3) "'the detail and depth of the victim-impact testimony with regard to the murder victim[s]'"; and (4) "'whether the victim-impact witness used emotionally charged language.'" *McAlpin*, 2022-Ohio-1567, at ¶ 114, quoting *Graham* at ¶ 126; *accord State v. Nicholson*, 2024-Ohio-604, ¶ 194.

{¶179} Even if victim-impact evidence is relevant and not overly emotional, however, Evid.R. 403(A) prohibits its admission if the "probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Victim-impact evidence carries a risk of prejudice because it "serves to inflame the passion of the jury with evidence collateral to the principal issue at bar."

*State v. White*, 15 Ohio St. 2d 146, 151 (1968).  Additionally,
the improper admission of victim-impact evidence "increases the
likelihood that arbitrary factors will influence the jury's
decisions, which increases the possibility that a reversal will
be required."  *Graham*, 2020-Ohio-6700, at ¶ 136.

{¶180} Moreover, "[i]n the event that evidence is introduced
that is so unduly prejudicial that it renders the trial
fundamentally unfair, the Due Process Clause of the Fourteenth
Amendment provides a mechanism for relief."  *Payne v. Tennessee*,
501 U.S. 808, 825 (1991).  Courts "have defined the category of
infractions that violate 'fundamental fairness' very narrowly,"
however.  *Dowling v. United States*, 493 U.S. 342, 352 (1990).

{¶181} In the case at bar, an obvious error did not occur
when the prosecutor introduced the case to the jury by citing
background information about the victim.  The prosecutor's brief
description of the victim in his opening statement simply
pointed out the victim's age and provided context that explained
that he had been living in Meigs County before his death.  *See*
*State v. Williams*, 2003-Ohio-4164, ¶43, quoting *State v.*

*Lorraine*, 66 Ohio St.3d 414, 420 (1993) ("the 'circumstances of the victims are relevant to the crime as a whole. The victims cannot be separated from the crime."); *State v. McKnight*, 2005-Ohio-6046, ¶ 102 (trial court did not plainly err by allowing prosecutor to comment, during opening statement, upon the victim's age and college attendance); *see id.* at ¶ 103 (plain error did not result from prosecutor's "brief and not overly emotional" statements during closing argument that described the victim "as a nice, kind-hearted, and helpful person to point out the likelihood that [the victim] provided a ride to [the defendant] on the night she disappeared").

**{¶182}** To the extent that the prosecutor improperly commented upon victim-impact evidence, we note that the trial court instructed the jury that opening statements are not evidence, and this instruction "cured any error," *Nicholson*, 2024-Ohio-604, at ¶ 199, citing *State v. Treesh*, 90 Ohio St.3d 460, 480 (2001). Furthermore, nothing suggests that allowing the prosecutor to begin the opening statement with a short description of the victim was so extremely unfair that allowing

the comment violated fundamental notions of justice so as to violate appellant's due process rights.  Consequently, we do not believe that the trial court plainly erred by failing to interrupt the State's opening statement to instruct the jury to disregard the statement relating to the victim's background. Nothing in the State's opening statement was laden with emotion or sought solely to appeal to the jury's sympathies.

**{¶183}** Moreover, Agent Jenkins's testimony that the victim was "very well-liked" in the community, and an "all-star athlete, uh, just one of those guys that everyone liked, everybody wanted to know, everybody wanted to be around" helped explain the circumstances that led officers to a suspect. Before the agent testified about the victim's background and relationships, he had stated that "in any murder investigation, especially when [officers] don't automatically know who the suspect is" officers "try to gain as much knowledge about that victim as [they] can."  Agent Jenkins stated that this inquiry involves considering the victim's activities, friends, family, spouse, children, and any other significant individuals.  He

explained that once an officer gathers background information about a victim, then the officer "can start piecing together what might have been going on in [the victim]'s life" and what motivated a person to kill the victim.

{¶184} Agent Jenkins's testimony thus did not serve as victim-impact evidence.  Instead, the agent stated that exploring the victim's background and relationships helped him understand whether anyone had a motive to kill him.  *See State v. Allard*, 75 Ohio St.3d 482, 500 (1996) ("testimony concerning [the victim]'s plan to remarry was relevant to [the defendant]'s motive to commit the murders"); *see generally State v. Maxwell*, 2014-Ohio-1019, ¶ 137 (testimony about the victim's "family and her divorce provided background information about [the victim]'s relationship with [the defendant] and the witnesses who testified" and was not prejudicial victim-impact testimony when it was not overly emotional).

{¶185} Additionally, even if Agent Jenkins's testimony that the victim was "tough" and had the "will to live" did not relate to the facts and circumstances of the crime or to officers'

investigation, the agent's testimony was brief and not overly emotional. *See Nicholson*, 2024-Ohio-604, at ¶ 197 (testimony that the victims "had been 'good kids' or 'respectful' or 'polite'" did not constitute improper victim-impact testimony when testimony was "brief, served to establish the existence of the victims, and provided the jury with a backdrop against which to view the relationships between [the defendant] and each of the victims"); *State v. Wilks*, 2018-Ohio-1562, ¶ 78 (testimony that the victim "'had a beautiful heart,'" "'was smart, caring, funny,'" "'loved to make people laugh,'" "'commanded attention,'" and was "'the best thing since sliced bread'" did not constitute improper victim-impact testimony when it was brief, not overly emotional, and did not mention the effect that the victim's death had on the families). *Compare Graham*, 2020-Ohio-6700, at ¶105, ¶ 117, ¶ 133, and ¶ 134 (trial court erred by allowing victim's father's testimony, spanning 10 pages of the transcript, about the victim's "life and the impact his death has had upon [the] father, especially when that testimony provided the jury with no relevant facts attendant to the

offense and the jury had already received evidence that [the victim] had been a living person," but the testimony was not overly emotional, so the error was not prejudicial); *McKnight* at ¶ 99 (father's statement that "his daughter's disappearance was 'like somebody hit [him] in the stomach with a sledgehammer' was of questionable relevance").

**{¶186}** We therefore do not believe that the trial court plainly erred by allowing Agent Jenkins's testimony regarding the victim's "tough[ness]," "will to live," background, or reputation in the community.

**{¶187}** To the extent appellant alternatively asserts that trial counsel rendered ineffective assistance of counsel by failing to object to the State's opening statement or to Agent Jenkins's testimony, appellant cannot establish that counsel's failure to object was anything other than legitimate trial strategy.[10]  *See State v. Conway*, 2006-Ohio-2815, ¶ 103 (trial

---

[10] We include the legal principles that apply to an ineffective-assistance-of-counsel claim in our discussion of appellant's seventh assignment of error.

counsel's "failure to make objections is not alone enough to sustain a claim of ineffective assistance of counsel"); *accord State v. Sowell*, 2016-Ohio-8025, ¶ 144 (rejecting argument that failing to preserve error is inherently prejudicial and stating, "[i]t is not enough that an alleged error resulted in a disadvantage for an accused"). And even if counsel's failure to object was deficient, appellant cannot establish prejudice. *See State v. Fears*, 86 Ohio St.3d 329, 347 (1999) (defendant must "show that any particular failure to object substantially violated [an] essential duty [and] was prejudicial"); *accord State v. Holloway*, 38 Ohio St.3d 239, 244 (1988) (stating that failure to object insufficient on its own to establish ineffective assistance of counsel; instead, a defendant still must demonstrate that counsel substantially violated an essential duty and that counsel's performance materially prejudiced the defense).

**{¶188}** Accordingly, based upon the foregoing reasons, we overrule appellant's fifth assignment of error.

**IV**

**Sixth Assignment of Error**

{¶189} In his sixth assignment of error, appellant argues that the record does not contain sufficient evidence to support his conviction and that his conviction is against the manifest weight of the evidence.  Appellant claims that the State failed to prove beyond a reasonable doubt that he "purposely cause[d] the death of another."[11]  Appellant contends that (1) the accomplice testimony of Richard Walker that implicated appellant was not credible, (2) the State failed to establish a proper chain of custody for several items of physical evidence and otherwise failed to establish that law enforcement officers followed proper protocols when collecting and logging evidence, and (3) the State did not properly authenticate the letters that appellant purportedly wrote while in jail.

{¶190} As we explain below, we believe that the record contains sufficient evidence to support appellant's conviction

---

[11] We recognize that appellant has not challenged the prior-calculation-and-design element needed to prove aggravated murder.  We limit our review accordingly.

and that his conviction is not against the manifest weight of the evidence.

## A

## Sufficiency and Manifest Weight of the Evidence

{¶191} Initially, we observe that "sufficiency" and "manifest weight" present two distinct legal concepts. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 23 ("sufficiency of the evidence is quantitatively and qualitatively different from the weight of the evidence"); *State v. Thompkins*, 78 Ohio St.3d 380 (1997), syllabus. A claim of insufficient evidence invokes a due process concern and raises the question whether the evidence is legally sufficient to support the verdict as a matter of law. *Thompkins*, 78 Ohio St.3d at 386; *see Jackson v. Virginia*, 443 U.S. 307, 316 (1979) (stating that one of the essential guarantees of the due process protections under the Fourteenth Amendment is "that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a

reasonable doubt of the existence of every element of the offense"). Appellate review of a sufficiency-of-the-evidence challenge is de novo. *Thompkins* at 386 ("'Whether the evidence is legally sufficient to sustain a verdict is a question of law.'"); *accord State v. Bertram*, 2023-Ohio-1456, ¶ 8 ("A challenge to the sufficiency of the evidence is reviewed de novo."); see Painter and Pollis, *Ohio Appellate Practice*, Appendix G (2023) (sufficiency challenge "trigger[s] de novo review").

{¶192} When reviewing the sufficiency of the evidence, an appellate court's inquiry focuses primarily upon the adequacy of the evidence; that is, whether the evidence, if believed, reasonably could support a finding of guilt beyond a reasonable doubt. *Thompkins* at syllabus. The "critical inquiry" on appeal "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson*, 443 U.S. at 318-319; *e.g., State v. Dean*, 2015-Ohio-4347, ¶ 150; *State v.*

*Jenks*, 61 Ohio St.3d 259, 273 (1991), *superseded by state constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102 (1997), fn. 4.  Furthermore, the sufficiency-of-the-evidence inquiry does not permit a reviewing court to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction."  *Thompkins*, 78 Ohio St.3d at 390 (Cook, J., concurring); *accord State v. Pountney*, 2018-Ohio-22, ¶ 19.

**{¶193}** Thus, when reviewing a sufficiency-of-the-evidence claim, an appellate court must construe the evidence in a light most favorable to the prosecution.  *E.g., State v. Hill*, 75 Ohio St.3d 195, 205 (1996); *State v. Grant*, 67 Ohio St.3d 465, 477 (1993).  A reviewing court will not overturn a conviction on a sufficiency-of-the-evidence claim unless reasonable minds could not reach the conclusion that the trier of fact did.  *State v. Tibbetts*, 92 Ohio St.3d 146, 162 (2001); *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001); *see also In re Z.C.*, 2023-Ohio-4703, ¶ 13, quoting *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶ 3, quoting *Thompkins* at 386, 678 N.E.2d 541, quoting *Black's* at

1433 ("'When applying a sufficiency-of-the-evidence standard, a court of appeals should affirm a trial court when "'the evidence is legally sufficient to support the jury verdict as a matter of law.'"'"); *Burks v. United States*, 437 U.S. 1, 16 (1978) (reversal for insufficient evidence "means that the government's case was so lacking that it should not have even been *submitted* to the jury" [emphasis sic]).

**{¶194}** "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence." *Thompkins*, 78 Ohio St.3d at 387. Appellate review under the manifest-weight-of-the-evidence standard is deferential. *See Z.C.* at ¶ 15 ("the phrase 'some competent, credible evidence' can be helpful in describing the reviewing court's deferential role in the manifest-weight analysis"); *Black's* (12th ed. 2024) (the phrase "manifest weight of the evidence" "denotes a deferential standard of review under which a verdict will be reversed or disregarded only if another

outcome is obviously correct and the verdict is clearly unsupported by the evidence").

**{¶195}** A manifest-weight challenge involves an inquiry into the persuasiveness of the evidence. *See State v. Martin*, 2022-Ohio-4175, ¶ 26, quoting *Eastley*, 2012-Ohio-2179, at ¶ 19 ("The term '"manifest weight of the evidence" . . . relates to persuasion.'"); *State v. Wilson*, 2007-Ohio-2202, ¶ 25 (manifest-weight inquiry asks "whose evidence is more persuasive"). A court that is considering a manifest-weight challenge must "'review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses.'" *State v. Beasley*, 2018-Ohio-493, ¶ 208, quoting *State v. McKelton*, 2016-Ohio-5735, ¶ 328. In conducting this review, "the appellate court sits as a 'thirteenth juror'" and may disagree with the jury's resolution of the conflicting testimony. *Tibbs v. Florida*, 457 U.S. 31, 42 (1982); *accord Thompkins*, 78 Ohio St.3d at 387. The reviewing court must bear in mind, however, that credibility generally is an issue for the trier of fact to resolve. *State v. Issa*, 93 Ohio St.3d 49, 67

(2001); *State v. Murphy*, 2008-Ohio-1744, ¶ 31 (4th Dist.).

"'Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility.'" *Barberton v. Jenney*, 2010-Ohio-2420, ¶ 20, quoting *State v. Konya*, 2006-Ohio-6312, ¶ 6 (2d Dist.), quoting *State v. Lawson*, 1997 WL 476684 (2d Dist. Aug. 22, 1997). As the *Eastley* court explained:

> "'[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment must be made in favor of the judgment and the finding of facts. . . .
> If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'"

*Id.* at ¶ 21, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984), fn.3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, § 60, at 191-192 (1978); *accord Z.C.*, 2023-Ohio-4703, at ¶ 14, quoting *Eastley* at ¶ 21 (when "weighing the

evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact").

{¶196} Thus, an appellate court will "leave the issues of weight and credibility of the evidence to the fact finder, as long as there is a rational basis in the record for [its] decision." *State v. Picklesimer*, 2012-Ohio-1282, ¶ 24 (4th Dist.); *accord State v. Howard*, 2007-Ohio-6331, ¶ 6 (4th Dist.) ("We will not intercede as long as the trier of fact has some factual and rational basis for its determination of credibility and weight."); *see also Tibbs v. Florida*, 457 U.S. 31, 45 (1982) (suggesting that a verdict is not against the weight of the evidence when the evidence "rationally supports [the] verdict").

{¶197} Accordingly, if the prosecution presented substantial, credible evidence upon which the trier of fact reasonably could conclude, beyond a reasonable doubt, that the essential elements of the offense had been established, the judgment of conviction is not against the manifest weight of the evidence. *E.g., State v. Eley*, 56 Ohio St.2d 169 (1978); *see also Eastley* at ¶ 12, quoting *Thompkins*, 78 Ohio St.3d at 387, quoting *Black's* (6th

ed.1990) (judgment not against the manifest weight of evidence when "'"the greater amount of credible evidence"'" supports it); *see also State v. Leonard*, 2004-Ohio-6235, ¶ 81, quoting *State v. Getsy*, 84 Ohio St.3d 180, 193-194 (1998), citing *Eley* at syllabus ("The question to be answered when a manifest-weight issue is raised is whether 'there is *substantial* evidence upon which a jury could reasonably conclude that all the elements have been proved beyond a reasonable doubt.'" [emphasis in original.]).   A court may reverse a judgment of conviction only if it appears that the fact finder, when it resolved the conflicts in evidence, "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"  *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).  A reviewing court should find a conviction against the manifest weight of the evidence only in the "'exceptional case in which the evidence weighs heavily against the conviction.'"  *Id.*, quoting *Martin*, 20 Ohio App.3d at 175; *accord State v. Clinton*,

2017-Ohio-9423, ¶ 166; *State v. Lindsey*, 87 Ohio St.3d 479, 483 (2000).

**B**

**Walker's Testimony**

{¶198} Appellant first questions the credibility of Walker's testimony that appellant shot the victim. Appellant argues that Walker's testimony that appellant shot the victim is not worthy of belief because, if appellant had been present at the crime scene, as Walker claimed, then the victim would have identified appellant when the victim's neighbor asked the victim who shot him. He claims that the victim instead identified the assailant as "some black guy." Appellant states that the victim's statement that "some black guy" shot him is not sufficient evidence to convict him of purposely killing the victim and that the jury lost its way by crediting Walker's testimony.

{¶199} Appellant also contends that Walker's testimony is not worthy of belief because (1) Walker entered into a plea bargain with the State that allowed him to escape a life sentence in

124

exchange for his testimony, and (2) he admitted that he had given law enforcement officers multiple stories.

{¶200} Appellant also asserts that the physical evidence, or lack thereof, does not corroborate Walker's testimony.

**1**

**"Some black guy"**

{¶201} Appellant first contends that the State's "entire case" rested on Walker's testimony and that the jury should not have believed Walker's testimony. Appellant observes that, before the victim died, the victim identified the person who shot him as "some black guy." Appellant asserts that the evidence shows that appellant and the victim knew each other. He thus suggests that if appellant truly had hit the victim with the butt of the shotgun, as Walker claimed, then appellant would have identified appellant as the "black guy" who shot him. Appellant argues that the victim's failure to identify appellant as the person who hit him or shot him indicates that Walker did not tell the truth about appellant's involvement. He claims that the victim identifying the assailant as "some black guy" is

thus insufficient to convict appellant and that the jury lost its way by crediting Walker's testimony.

{¶202} Appellant additionally claims that a reasonable juror could not have believed Walker's testimony that, when the victim opened the door, appellant hit the victim and caused him to stumble back into the house.  Appellant questions whether appellant, "lurking out of sight along the side of the door," could have "muster[ed] enough force to knock a college football player off-balance."  He states, "If [appellant] was close enough to hit [the victim] with the butt of a shotgun, why didn't [the victim] tell anybody?"  Appellant disputes the State's assertion that the victim did not know that appellant "was the one who hit him with the butt of the shotgun because [appellant] was hiding along the side of the door when [the victim] answered and was hit."  Appellant claims that the record contradicts the State's suggestion and contends that Walker testified that appellant hit the victim in his chest in a manner that caused the victim to "stumble[] back."

{¶203} The State does not agree with appellant that the victim's failure to name appellant as the person who shot him shows that the jury lost its way when crediting Walker's testimony that appellant shot the victim. The State contends that the evidence established that Nelson, an African American male, shot the victim and that the victim did not know Nelson. The State argues that the evidence further showed that, after Nelson shot the victim, appellant "approached [the victim] from behind and shot him with a shotgun multiple times in the back." The State asserts that the victim most likely did not see who shot him in the back. According to the State, therefore, the victim's statement that "some black guy" shot him likely referred to Nelson.

{¶204} The State further argues that the victim's failure to specify appellant as one of the persons who shot him could be due to "any number of reasons." The State suggests that the victim may not have seen who hit him with the butt of the shotgun "because Nelson knocked on the door and [appellant] was hiding along the side of the door when [the victim] answered and

was hit." The State also points out that the victim had sustained gunshot and shotgun wounds that proved to be fatal and was struggling to survive when he advised his neighbor that "some black guy" shot him. The State asserts that, given the victim's dire situation, his lack of specificity about who shot him and who ransacked his house was perfectly reasonable.

{¶205} Regarding appellant's argument that the victim identifying the assailant as "some black guy" is insufficient evidence to convict appellant, we observe that the State's case did not rest solely upon the victim's statement that "some black guy" shot him. Instead, the State presented other evidence to suggest that appellant was the individual who shot the victim in the back with the shotgun. Walker testified that, after Nelson shot the victim, he and Nelson ran to the car, and appellant stayed behind. Walker then heard two shotgun blasts. Appellant did not have any shotgun wounds, and the only other person in the vicinity who displayed evidence of being shot with a shotgun was the victim. The circumstantial evidence thus indicates that

appellant was the individual who shot the victim with the shotgun.

{¶206} Additionally, the State presented evidence that appellant wrote letters that suggested he had attempted to concoct a story to attempt to prove that he did not shoot the victim. Appellant also sustained a gunshot wound to his arm, and the bullet removed from his arm matched the bullet retrieved from the victim's body. We therefore do not agree with appellant that the State's case rested solely upon the victim identifying the individual who shot him as "some black guy."

{¶207} Moreover, if the victim was shot from behind, then, as the State asserts, the victim most likely did not see who shot him in the back with the shotgun. His identification of "some black guy" who shot him may have referred to Nelson. The victim did not know Nelson, and Walker testified that Nelson shot the victim with a .45-caliber weapon. The victim's statement that "some black guy" shot him thus may have referred to Nelson's act of shooting the victim with the .45-caliber weapon.

{¶208} With respect to appellant's assertion that Walker testified that appellant hit the victim in the chest, we observe that the record does not support appellant's assertion. Instead, the prosecutor asked Walker if he recalled where appellant hit the victim with the butt of the shotgun. Walker stated, "I guess like his chest." The prosecutor pressed Walker for a more definitive answer and asked him whether he knew where appellant hit the victim. Walker stated that he did not. He clarified that he saw appellant hit the victim but did not recall which part of the victim's body appellant hit. Walker did, however, recall that, after appellant hit the victim, the victim "stumbled back" into his house.

{¶209} Furthermore, none of the evidence presented at trial indicates whether the victim even had an opportunity to view appellant's face to be able to identify him by name. During his testimony, Walker did not (1) explain why the victim failed to identify appellant by name or (2) give any indication that the victim had the opportunity to see appellant's face. Walker stated that Nelson knocked on the door and asked the victim if

he could use the phone.  Before knocking on the door, Walker and appellant had been standing toward the right side of the door, potentially out of the victim's line of sight.  When the victim opened the door, appellant hit him with the butt end of the shotgun.  The record does not indicate that the victim saw appellant's face before appellant hit him with the butt of the shotgun or that he had the opportunity to view appellant's face. Even if he had, as the State observes, after the victim was shot, he was struggling for his life.  Thus, any failure to specifically identify appellant as the individual who hit him with the butt of the shotgun would be eminently understandable.

**{¶210}** Moreover, as the State notes, the shotgun wounds indicate that the assailant shot the victim in the back.  Thus, the victim most likely did not have any opportunity to turn around and see who shot him with the shotgun.  Plus, the shooting occurred in the dark of night, and neither party presented any evidence regarding the lighting conditions at the time of the victim's shooting to suggest that he would have been able to identify appellant if he had seen his face.

Consequently, the victim's failure to identify appellant as the individual who shot him, or to otherwise state that appellant was present, does not suggest that the jury clearly lost its way by crediting Walker's testimony.

**2**

**Walker's Plea Bargain and Lies**

**{¶211}** Appellant next claims that Walker's testimony was not credible because he "had a very clear reason to lie to [the] jury and minimize his own culpability in the murder of [the victim]." Appellant notes that Walker agreed to cooperate with the State and, in exchange, received a prison sentence of 15 to 21½ years.

**{¶212}** Appellant further argues that lies besieged Walker's testimony and made his testimony unworthy of belief. Appellant contends that Walker's testimony shows that "he is good at lying" and that he even admitted that he told lies. Appellant states that Walker gave officers several stories about what transpired, yet the prosecution urged the jury to believe that

Walker told the truth at trial.  He asserts that the jury lost its way by crediting Walker's testimony.

**{¶213}** We again note that the trier of fact sits in the best position to determine whether a witness is credible and whether the witness's testimony is reliable.  *See Seasons Coal Co.*, 10 Ohio St.3d at 80.  The trier of fact has "the benefit of actually seeing the witnesses testify," observing facial expressions and body language, hearing voice inflections, and discerning "qualities such as hesitancy, equivocation, or candor (or the lack of it)."  *State v. Fell*, 2012-Ohio-616 (6th Dist.), ¶ 14; *accord State v. Pinkerman,* 2024-Ohio-1150, ¶ 26 (4th Dist.).  Thus, when assessing a witness's credibility, the trier of fact "should consider the demeanor of the witness and the manner in which he testifies, his connection or relationship with the prosecution or the defendant, and his interest, if any, in the outcome."  *State v. Antill*, 176 Ohio St. 61, 67 (1964); *see also Ohio Jury Instructions*, CR § 207.05 (Rev. Dec. 10, 2011) (instructing jurors to consider the following factors when determining the credibility of each witness:  "the appearance of

each witness upon the stand; the witness' manner of testifying; the reasonableness of the testimony; the opportunity the witness had to see, hear, and know the things about which the witness testified; and the witness' accuracy of memory, frankness or lack of it, intelligence, interest, and bias, if any, together with all the facts and circumstances surrounding the testimony").

**{¶214}** Appellate courts do not share the trier of fact's same perspective and cannot replicate "[t]he intimate and evanescent nature of observed testimony." *Fell*, 2012-Ohio-616, at ¶ 14 (6th Dist.). For this reason, appellate courts largely defer to the trier of fact's credibility determinations so long as all of the evidence in the record "reveals no inconsistencies or other conflicts in the evidence" to suggest that the jury clearly lost its way by finding a defendant guilty, *see State v. Montgomery*, 2016-Ohio-5487, ¶ 79.

**{¶215}** In the case sub judice, we do not agree with appellant that the jury lost its way be crediting Walker's testimony. Defense counsel made the jury well aware of Walker's plea

agreement and, during cross examination, thoroughly tested Walker's credibility by pointing out that Walker had given law enforcement officers multiple stories before settling on the one that he told at trial. During closing arguments, defense counsel further urged the jury not to believe Walker's testimony.

{¶216} Additionally, the trial court instructed the jurors that their job was to assess the credibility of the witnesses who testified. The court informed the jurors to evaluate the truthfulness of witness testimony by considering (1) each witness's appearance and mannerisms, (2) the reasonableness of the witness's testimony, (3) the witness's knowledge of the facts, or opportunity to perceive the facts, stated in the witness's testimony, (4) the accuracy of the witness's memory, (5) the witness's frankness or lack of it, (6) the witness's intelligence, (7) the witness's interest or bias, if any, and (8) all of the facts and circumstances surrounding the witness's testimony. The court also advised the jurors that they could

"believe or disbelieve all or any part of the testimony of any witness."

**{¶217}** The court further instructed the jurors that an accomplice's testimony, like Walker's, may be subject to "grave suspicion."  The jury thus had the opportunity to weigh the competing concerns regarding Walker's testimony, and we do not find anything in the record to suggest that the jury clearly lost its way by crediting Walker's testimony.  *See State v. Webster*, 2021-Ohio-3218, ¶ 74 (10th Dist.) (jury may believe witnesses' testimony even if those witnesses admitted their involvement in the offenses and entered into plea agreements with the State).  Furthermore, even if Walker's testimony suffered from any credibility problems, appellant has not shown that this case is an "'"exceptional case in which the evidence weighs heavily against the conviction,"'" *State v. Clinton*, 2017-Ohio-9423, ¶ 176, quoting *Thompkins*, 78 Ohio St.3d at 387, quoting *Martin*, 20 Ohio App.3d at 175.

**3**

**Lack of Corroborating, Physical Evidence**

{¶218} Appellant next contends that the jury lost its way by crediting Walker's testimony when no physical evidence corroborated his testimony. Appellant submits that if Walker had been telling the truth when he testified that appellant ransacked the victim's house after hitting him with the butt of the shotgun, then officers would have discovered appellant's fingerprints in the victim's house. Appellant states that the lack of fingerprint evidence to place him inside the victim's home indicates that Walker did not tell the truth. He additionally submits that officers did not discover any gunshot residue on appellant's person or vehicle and that the absence of this type of physical evidence supports his contention that he did not shoot the victim.

{¶219} In the case at bar, even if officers did not locate appellant's fingerprints inside the victim's home or gunshot residue on his person, "no rule of law" requires "a witness's testimony [to] be corroborated by physical evidence such as fingerprints, for example, or the weapon allegedly used by the accused." *State v. Nix*, 2004-Ohio-5502, ¶ 67 (1st Dist.); *see*

*State v. Whitt*, 2025-Ohio-424, ¶ 24 (3rd Dist.) ("the absence of a fingerprint analysis in a case does not render a conviction against the manifest weight of the evidence"); *see also State v. Williams*, 2019-Ohio-10, ¶ 22 (8th Dist.) ("[p]hysical evidence is not required to sustain a conviction."); *State v. Jeffries*, 2018-Ohio-2160, ¶ 72 (1st Dist.) (concluding that "the state is not required to present corroborating DNA test results or other corroborating physical evidence to meet its burden of proof, even in a rape case."); *State v. Martin*, 2016-Ohio-802, ¶ 22 (1st Dist.) ("[w]hile the absence of DNA evidence is probative, it is not dispositive."); *State v. Peeples*, 2014-Ohio-4064, ¶ 21 (10th Dist.) ("a lack of physical evidence, standing alone, does not render appellant's conviction against the manifest weight of the evidence").  Rather, "the testimony of one witness, if believed by the jury, is enough to support a conviction."  *State v. Strong*, 2011-Ohio-1024, ¶ 42 (10th Dist.); *see also State v. J.M.*, 2015-Ohio-5574, ¶ 17 (10th Dist.) (testimony identifying the defendant as the assailant was sufficient to support the defendant's conviction even without conclusive DNA evidence);

*State v. Garner*, 2008-Ohio-944, ¶ 13 (10th Dist.) ("the state was not required to provide physical evidence placing appellant at the scene of the crime, nor was it required to establish any connection between appellant and the victims.  The state could have carried its burden of proof solely through identification testimony."); *State v. Jackson*,  2009-Ohio-6407, ¶ 16 (7th Dist.) ("If [the witness's] testimony is believed then the lack of fingerprints, DNA, footprints or any other type of physical evidence does not render the conviction against the manifest weight of the evidence.").  Thus, even if the State did not present physical evidence to corroborate Walker's testimony, Walker's testimony is sufficient evidence to place appellant at the scene and to implicate appellant in the victim's murder. *See, e.g., Strong,* 2011-Ohio-1024, at ¶ 42 (10th Dist.).

{¶220} Moreover, at the crime scene, officers discovered a pair of shorts with appellant's DNA on them, along with a Crown Royal bag that contained Nelson's and appellant's DNA.  In addition, as we noted above, appellant had sustained a gunshot wound on the same date as the victim's murder, and the bullet

removed from appellant's arm matched the bullet recovered from the victim's body.  Thus, a logical inference is that appellant was present at the crime scene.

{¶221} Furthermore, while appellant sat in jail awaiting trial, he sent a letter that attempted to convince his codefendant to concoct a story to help appellant avoid a life sentence.  Appellant also wrote "BURN NOTICE" on this letter, which suggests that he was conscious that the letter contained damaging information.

{¶222} For all of the foregoing reasons, we do not agree with appellant's argument that an absence of fingerprint or other physical evidence shows that the jury clearly lost its way by crediting Walker's testimony.

### C

### Authentication and Chain of Custody

{¶223} Appellant next contends that the State's physical evidence was unreliable due to authentication and chain-of-custody issues.

{¶224} A proponent of evidence must authenticate or identify the evidence before a court may admit the item into evidence. Dickinson, *Ohio Trial Practice* § 22:2 (2024 ed.), citing 7 Wigmore, *Evidence* § 2128-69 (3d ed.). "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A). The proponent need only establish a prima facie showing "of authenticity, not a full argument on admissibility." *State ex rel. Montgomery v. Villa*, 101 Ohio App.3d 478, 484 (10th Dist. 1995), quoting *United States v. Reilly*, 33 F.3d 1396, 1404 (3d Cir. 1994). "This low threshold standard does not require *conclusive* proof of authenticity, but only sufficient foundational evidence for the trier of fact to conclude that the [evidence] is what its proponent claims it to be." (Emphasis in original.) *State v. Easter*, 75 Ohio App.3d 22, 25 (4th Dist.1991), citing 1 Weissenberger, *Ohio Evidence* (1991) 4-5, § 901.2. Once a proponent satisfies the authentication threshold for admitting the evidence, "[t]he

ultimate decision on the weight to be given to that piece of evidence is left to the trier of fact." *State v. Brown*, 2002-Ohio-5207, ¶ 35 (7th Dist.).

{¶225} "'Chain of custody is a part of the authentication and identification mandate set forth in Evid.R. 901, and the state has the burden of establishing the chain of custody of a specific piece of evidence.'" *State v. Corder*, 2012-Ohio-1995, ¶ 15 (4th Dist.), quoting *State v. Brown,* 107 Ohio App.3d 194, 200 (3d Dist. 1995). The State need not, however, "prove a perfect, unbroken chain of custody." *State v. Keene*, 81 Ohio St.3d 646, 662 (1998). Thus, "[a] strict chain of custody is not always required in order for physical evidence to be admissible." *State v. Wilkins*, 64 Ohio St.2d 382, 389 (1980). Instead, "[a]s long as it is reasonably certain that no tampering or substitution occurred regarding the particular item of evidence, the state need not negate all possibilities of tampering or substitution." *State v. Barzacchini*, 96 Ohio App.3d 440, 458 (6th Dist. 1994), citing *State v. Moore,* 47 Ohio App.2d 181, 183 (9th Dist.1973). Any breaks in the chain of

custody "go to the *weight* to be afforded the evidence, not to the *admission* of the evidence." (Emphasis in original.) *State v. Gross*, 2002-Ohio-5524, ¶ 57 (arguments that an officer failed to change gloves and that a second round of testing found previously undiscovered genetic material on evidence at issue related to the weight, not the admission, of the evidence); *see also State v. Richey*, 64 Ohio St.3d 353, 360 (1992), *overruled on other grounds*, *State v. McGuire*, 80 Ohio St.3d 390, 402–404 (1997) ("The possibility of contamination goes to the weight of the evidence, not its admissibility").

**1**

**Crown Royal Bag**

{¶226} Appellant first asserts that the jury clearly lost its way by according any weight to the DNA evidence discovered on the Crown Royal bag. He contends that the State completely failed to establish a chain of custody for the Crown Royal bag. He observes that no one could identify how the Crown Royal bag ended up on a law enforcement officer's cruiser.

{¶227} Appellant further argues that even if the evidence obtained from the Crown Royal bag was admissible, the existence of appellant's DNA on the outside of the bag does not establish that he was present at the scene when the victim was shot or that he otherwise participated in the murder. Appellant claims that if he had shot the victim with a shotgun, then his DNA would have been on the box of shells inside the bag, not simply on the outside of the bag. He further notes that the State's DNA expert testified that appellant's "DNA could have gotten on the outside of the Crown Royal Bag from Nelson . . . transferring [appellant]'s DNA."

{¶228} The State contends that it properly authenticated the Crown Royal bag and that any breaks in the chain of custody go to weight, not admissibility. The State argues that nothing required it to present evidence showing how the Crown Royal bag ended up on the law enforcement officer's cruiser. The State observes that, in appellant's codefendant's appeal, this court concluded that the lack of evidence regarding who may have placed the Crown Royal bag on the law enforcement officer's

cruiser did not render the evidence discovered on the Crown Royal bag inadmissible. *See State v. Nelson*, 2023-Ohio-3566, ¶¶ 26-27 (4th Dist.).

{¶229} The State further disputes appellant's argument that if he had shot the victim with a shotgun, then his DNA would have been discovered on the box of shells inside the Crown Royal bag. The State claims that appellant's argument "illustrates a misunderstanding as to how touch DNA is found and how DNA is left on items. Just because a person touches an item, there is no guarantee that DNA, or a sufficient amount of DNA for testing, would be left behind."

{¶230} In the case at bar, we do not agree with appellant that the jury clearly lost its way by according weight to the DNA evidence discovered on the Crown Royal bag. The State properly authenticated the Crown Royal bag and established that no tampering or substitution occurred from the time that officers discovered it through the date of the trial. Even though no one saw anyone place the bag on Deputy Spiker's cruiser, multiple witnesses stated that officers discovered the

bag sitting on Deputy Spiker's cruiser.  Contrary to appellant's belief, nothing required the State to prove the bag's "chain of custody" before officers discovered it.

{¶231} Furthermore, appellant does not cite any authority for his novel proposition that the State must prove how an item came to be at a crime scene.  As we noted in *Nelson*, nothing requires the State to prove an item's "chain of custody" before officers discovered it at a crime scene, "an onerous and impossible" burden, 2023-Ohio-3566, ¶ 26 (4th Dist.).  We further observed that "when law enforcement arrived at the scene, they had no way of knowing how various evidentiary items came to be strewn about in the various locations in which they were found."  *Id.*

{¶232} Additionally, we pointed out that "Nelson's counsel could and did argue against the jury giving it much weight." *Id.*  Likewise, in the case before us, appellant's trial counsel could and did argue that the jury should not give the Crown Royal bag much weight:

> But they ignored the fact that there was a mystery surrounding this crown royal bag. Where did it come from? How did it get on Spiker's vehicle?  Did you hear any

> testimony about them trying to find out where that crown royal bag came from?  Was there any investigation as to where it came from, how it got there, interviewing witnesses, interviewing individuals around the crime scene as to where that crown royal bag came from?

{¶233} Consequently, appellant's trial counsel made the jurors well aware of his belief that they should afford the DNA evidence found on the Crown Royal bag little weight.  Although we do not know what weight the jury gave this evidence, nothing suggests that the jury clearly lost its way if it did, in fact, favorably weigh this evidence when deciding to convict appellant.

{¶234} Appellant further contends that even if the bag was admissible,[12] the bag does not prove that appellant was at the crime scene or that he shot the victim with a shotgun.  He observes that his DNA was not located on the drawstring of the bag or on the box of shotgun shells found inside the bag. Appellant contends that if he had shot the victim with a

---

[12] We note that appellant has not raised an assignment of error that asserts that the trial court erred by admitting into evidence the Crown Royal bag.

shotgun, then "his DNA would have been on the box of shells in the bag, not just the outside."

**{¶235}** Assuming, arguendo, that this one piece of evidence does not prove that appellant was at the crime scene or that he shot the victim with a shotgun, appellant's focus on one piece of evidence does not establish that the jury clearly lost its way and committed a manifest miscarriage of justice.  A manifest-weight review requires a court to consider all of the evidence admitted at trial, not one piece of evidence in isolation.  *See Beasley*, 2018-Ohio-493, at ¶ 208, quoting *McKelton*, 2016-Ohio-5735, at ¶ 328 (a court that is considering a manifest-weight challenge must "'review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses'"); *see also State v. Payne*, 2019-Ohio-4218, ¶ 17 (9th Dist.) ("a challenge to the manifest weight of the evidence nonetheless requires this [c]ourt to not just review selected portions of evidence in isolation, but to instead review the *entire* record [emphasis sic.]); *State v. Johnson*, 2007-Ohio-3332, ¶ 23 (7th Dist.) ("A review of the

manifest weight of the evidence involves all of the evidence and the reasonable inferences to be drawn from this evidence, and not just one piece of evidence in isolation."). Even without the DNA evidence found on the Crown Royal bag, as we explain below, the record otherwise contains substantial evidence to support appellant's conviction.

**2**

**Mishandled Evidence**

**{¶236}** Appellant also argues that "all of the [S]tate's evidence was improperly handled." Appellant points out that Meigs County Sheriff's Deputy Thomas Dillard admitted that he had not been fully trained regarding evidence-logging procedures and that not all of the evidence had been checked in properly. Appellant states that Deputy Dillard's testimony "casts doubt on every piece of evidence collected and used by the State at trial" and that the jury lost its way by relying on the State's evidence.

**{¶237}** Appellant additionally faults Sergeant Mohler for removing two shotgun rounds and a pair of shorts from the

roadway and then placing ink pens in their place without photographing the evidence or marking them with cones.  He asserts that the sergeant "destroyed the integrity of the crime scene because there was no way to tell where the items originally were found."

{¶238} Appellant also criticizes officers for not recalling specific details about the evidence-collection procedure and for some inconsistencies between the officers' testimony.  For example, appellant states that Sergeant Mohler testified that he secured the shotgun rounds and shorts in Meigs County Sheriff's Deputy Marty Hutton's vehicle, but Deputy Hutton did not recall these items being placed in his car.  Appellant also contends that Deputy Myers testified that he obtained the shotgun rounds and shorts from Sergeant Mohler, but Ohio Bureau of Criminal Investigation Special Agent Austin testified that he gave the evidence to Meigs County Sheriff's Deputy Jimmy Riley. Appellant asserts that "[t]his haphazard notation and collection of evidence spoiled that evidence, and no reasonable juror would afford any weight to it at all."

{¶239} The State argues that nothing suggests that Deputy Dillard's lack of training or Sergeant Mohler's evidence-collection procedure rendered the State's evidence unworthy of belief.  The State observes that the jury heard evidence regarding Deputy Dillard's lack of training and Sergeant Mohler's evidence-collection procedure and could assign it appropriate weight.

{¶240} We do not find any merit to appellant's argument that the jury lost its way by relying on the State's evidence.  As with his argument regarding the Crown Royal bag, in his closing argument, defense counsel asserted that the jury should not trust the State's evidence due to evidence-collection and chain-of-custody issues:

> Think for a moment about how all the evidence in this case was handled.  It wasn't handled very well, was it?  You got things at the crime scene that weren't documented that were moved, you got things going out of the evidence locker without any documentation, you got the crown royal bag and the mystery surrounding it, all of those things that in a case like this, you're supposed to be specific about and definite about and careful with was handled with I'm . . . I'm just the new trainee and I didn't know, no one trained me.  Those logs, the chain of custody logs, all of them, all over the place.  But

nothing really at that crime scene indicates that Jaquan Hall did anything in this case.

**{¶241}** Consequently, appellant's trial counsel made the jurors well aware of his belief that the State's evidence bore little weight.  Nothing suggests that the jury clearly lost its way by crediting the State's evidence when deciding to convict appellant.

**D**

**Letters**

**{¶242}** Appellant next argues that the jury lost its way by relying on letters that the State claimed appellant had written. Appellant asserts that the State failed to properly authenticate the letters and that Agent Jenkins's testimony that Nelson told the agent that appellant sent the letters to him was hearsay. Appellant further contends, without elaboration, that allowing Agent Jenkins to testify that Nelson stated that appellant sent the letters to Nelson "violat[ed] *Bruton v. U.S.*, 391 U.S. 123 (1968)."  Appellant additionally claims that the trial court improperly allowed Meigs County Sheriff's Sergeant Frank Stewart

to testify about the origin of the letters without an adequate foundation or establishing a chain of custody.

{¶243} The State contends that "multiple witnesses testified about the letters" and established that "the letters were what they purported to be—letters written by Appellant—which is the requirement for authentication." The State asserts that it need not prove that anyone saw appellant write the letters or that the handwriting belonged to appellant. The State argues that it proved that appellant wrote the letters "based upon how they were obtained and the contents of the letters."

**1**

**Hearsay**

{¶244} We first summarily reject appellant's argument that Agent Jenkins's testimony violated *Bruton v. United States*. This summary argument tucked inside an assignment of error regarding the manifest weight of the evidence is outside the scope of the assignment of error. Because appellant has not raised this issue as a separate assignment of error, we decline to address it. *See State v. Harlow*, 2014-Ohio-864, ¶ 10 (4th

Dist.) (appellate courts "sustain or overrule only assignments
of error and not mere arguments").

## 2

## Authentication

{¶245} Evid.R. 901(B)(4) states that a proponent may
authenticate evidence by showing that the "[a]ppearance,
contents, substance, internal patterns, or other distinctive
characteristics" of the evidence, "taken in conjunction with
circumstances," support a finding that the matter in question is
what its proponent claims.  Thus, "'a letter may be
authenticated by evidence of its distinctive contents such as
facts contained in the missive that only the writer may know.'"
*Brown,* 2002-Ohio-5207, at ¶ 39 (7th Dist.), quoting *State v.
Chamberlain,* 1991 WL 144181, *4 (8th Dist. July 25, 1991); *see
State v. Schulman*, 2020-Ohio-4146, ¶ 38 (10th Dist.), quoting
Staff Note, Evid.R. 901(B)(4) (a letter may be connected to a
defendant "'by the very fact that the matters set forth in the
letter . . . were known peculiarly to a particular person," or
"'by its linguistic patterns and characteristics'"); *State v.*

*Hernandez*, 1991 WL 44362, *5 (7th Dist. Mar. 29, 1991) ("A letter may be related to a particular person by the fact that the matters set forth in the letter were known peculiarly to a particular person."). Indeed, "a document may be properly authenticated and admissible against a particular criminal defendant even when the author of the document is unknown, if the circumstances demonstrate that, for instance, the document must have been authored by the defendant or a co-conspirator." (Citations omitted.) *Brown,* 2002-Ohio-5207, at ¶ 40 (7th Dist.). Whether a defendant in fact authored a letter and the weight to afford the evidence are questions for the trier of fact. *See State v. Giles*, 2021-Ohio-2865, ¶ 35 (6th Dist.) (the weight of the evidence is separate determination from the authentication requirement and is reserved for the trier of fact).

**{¶246}** In the case at bar, we do not agree with appellant that the State did not present adequate evidence to prove that he wrote the letters or that the letters were not entitled to any weight. As we explain below, both Agent Jenkins and

Sergeant Stewart testified that the letters contained distinctive contents that suggested appellant wrote the letters.

**a**

***Agent Jenkins***

**{¶247}** Agent Jenkins stated that he received an email from the Washington County jail that contained two attachments: (1) an envelope addressed to Trevon Jones with a return address for the Washington County Jail that included appellant's last name and first initial; and (2) a letter. The prosecutor asked Agent Jenkins if he could identify any information on the envelope or in the letter that led him to believe that the letter originated from appellant. He responded, "Absolutely," and then identified the following information that suggested appellant wrote the letter. The envelope contained appellant's last name and first initial, along with the initials, "BNT," which the agent knew to be "some type of music company" that appellant started. The letter contained details about the crime and indicated that the author had knowledge about those details. The letter stated that the murder "was not planned," but was a

"bad drug deal." The author indicated that the victim shot the author, and the victim "and someone fought for his gun." The letter also named the victim and listed the offenses with which appellant had been charged: "murder, aggravated murder, complicity to murder, conspiracy." The letter further contained the author's explanation for the events that led to the victim's death. It stated, "Quan never went inside. [The victim] shot him." The letter continued to suggest that Nelson shot the victim. The letter indicated that a shotgun had been used, but the author did not "remember who shot the [shotgun]."

**{¶248}** The agent additionally identified what he believed to be code words in the letter, such as, "get little bro with guy." Agent Jenkins stated that officers believed "little bro" was the third individual involved in the victim's death (i.e., Richard Walker), and "guy" referred to appellant's attorney. The letter instructed "little bro" to "lay low," meaning do not talk to the police.

**{¶249}** Agent Jenkins further explained that officers at the jail discovered the letter shortly after Nelson's arrest, and

the author instructed the recipient to "figure out who his lawyer is." The agent interpreted the letter to refer to discovering the identity of Nelson's lawyer.

{¶250} The letter also contained the words "burn notice," written in large capital letters, "with a line over top of burn notice and a line below burn notice." Agent Jenkins stated that this phrase clearly indicated that the recipient of the letter should "set fire to it."

{¶251} Agent Jenkins thus gave the jury adequate information to conclude that appellant wrote the letter. Appellant's last name and first initial appeared on the envelope, and the return address was the Washington County jail, where appellant had been housed while awaiting trial. *See State v. Townsend*, 2005-Ohio-6945, ¶ 55 (7th Dist.) ("the court can consider the envelope and contents" when ascertaining the authenticity of a letter and "the return address can be relevant to the determination of authenticity"). The contents of the letter further suggested that appellant wrote the letter: it contained details of the crime, the victim's name, appellant's name, and code names for

appellant's codefendant and attorney. *See State v. Gaines*, 2003-Ohio-6855, ¶ 12 (8th Dist.) (letters "were very clearly written by" the defendant when the letters used the defendant's first name or an abbreviated first name and referred to "a number of other facts that were peculiar to [the defendant]"); *see generally Giles*, 2021-Ohio-2865, at ¶ 26-37 (6th Dist.) (letter properly authenticated when evidence showed that the defendant authored the letter using his street name, addressed it to his codefendant using the codefendant's street name, and the letter included details about the defendant's trial). Furthermore, the trial court admitted into evidence the envelope and the letter so that the jury could examine it more closely to decide whether appellant wrote the letter.

**{¶252}** Based upon all of the facts and circumstances, the jury quite reasonably could have determined that appellant wrote the letter.

*b*

*Sergeant Stewart*

{¶253} Sergeant Stewart testified that Nelson's mother gave him some letters that he believed appellant had authored. The sergeant recited the contents of the letters as follows:

> I need you to give this to little K. You all sit together until everything is done and burn this. Then the first paragraph there starts this doesn't need to be delayed no more. It's fucked the amount of stress this has been on me, my mom, my family in general. Today you're going to have to call this lawyer and speak to him or his secretary. 304-485-0990, George Cosenza, top lawyer in the state. Nothing you should be scared of. They just need you to tell them what happened. Don't tell the cop, tell George. We went up there for some weed, when you and dude from UC went into the house, the white boy thought that he was trying to rob him, so he grabbed his gun and made ya'll start emptying ya'll's pockets. Thought ya'll took money. When his dog started barking, he opened the door, you was standing by the door and saw it was Quan. Next thing he let off a shot and Quan hit the ground. You fought for the gun then shot him. You went to grab me from lying near the front of the garage and helped me back to the car. You turned around and didn't see the dude from UC, thought he was still in the house. When you got back to the car, you heard two loud shots and that's when me and you left. We left dude up there and headed back to Charleston. You dropped me off on the west side near the Woo, Quan was out of it the whole time, bleeding bad. You went home and you didn't know if I went to the hospital or not. You just don't want Quan to go down for something that he didn't do. And we'll go back up here to the left side of this letter. It says rewrite this word for word, our story has to match up. They know he shot me . . . they know he shot me first, they know I didn't shot him. I just need

a witness.  Do this now on the extra piece of paper. And page two, write i[t] as when me and dude from UC made us start emptying our pockets and then it says write this.  Went up there for some weed.  When me and dude from UC went into the house, the white boy thought we was trying to rob him.  He thought one of us took his money.  His dog started barking and then opened the door. I was standing by the door and saw it was Quan.  He let a shot off and then Quan hit the ground.  I fought him for his gun and shot him.  I went to go help Quan and we headed to the car.  I didn't see dude from UC, he must have been in the house or something.  When we got close to the car, I heard two loud shots.  That's when me and Quan left dude up there.  When we got back to Charleston, I dropped Quan off on the west side and went home.  I just don't want Quan to go down for something he didn't do.  And then next to the last paragraph it says write this with an arrow pointed over.  The dude from UC looked like he was six, two, low tapper haircut, looked like he worked out, wore a black Nike jumpsuit.  He was in the car when you got picked up.  Don't remember what time picked you up from the bottom of the hill, dude was probably two hundred pounds, I think that's what that says.  Uh, says nigga, I'm facing twenty five (25) to life.  You don't come through for a nigga, that's some real pussy shit.  Boy, you're not facing no jail time, no prison time, all you have to do is call this number and tell him you need a lawyer.  Tell him that story word for word, rewrite it so you don't forget.  Nigga, there is nothing to be scared of.  I just need a witness and by November I'm going to have to say something. Don't put me in this situation where I'm going to have to name drop.  If you get your lawyer now and tell him today, they won't come and arrest you.  I done told my family already, so they know.  My cousin might come see you, but probably not.  I need this done now though. . . . I need this done now though, boy.  Not next week,

not next month. I'm facing life, you can give me one day, dude. Call this number now until you get ahold of someone and rewrite this letter. Burn everything but your paper. Keep your letter. There can't be no fuck ups, shit has to hold water. Word for word. Don't fuck up, everything else is on hold, write this down and talk to George. Hi, my name is Keontae Nelson. I need a lawyer for a murder case. My friend, say my name in [parentheses], is locked up right now and I don't want to see him spend the rest of his life behind bars. Basically, this happened then tell him the story. Any questions you don't know, say you can't remember right now. Don't make shit up. . . . [W]ent up there for some smoke with little K and a dude from UC, K and the dude went into the house. I heard someone yell chill, chill then I went up to the door. [The victim] seen me and shot me for some reason. I later found out that dude was trying to take some money. I guess he might have assumed I was in on it. I hit the ground and rolled out into the street. Keontae helped me up and we went to the car and left dude from UC up there. I remember waking up in Charleston and had Keontae drop me off at my brother in law's house. He left and I went to the hospital. This is my story. Keep it to the script. Everything has to match. Rewrite your story, call George now. This is what I'm saying in November. Then the final page says burn.

**{¶254}** Sergeant Stewart identified multiple parts of the

letter that led him to believe that appellant had authored it.

For instance, the letter contained the name and phone number of

appellant's attorney. The letter also contained appellant's

name and nickname in a manner that suggested he had authored the

letter. At one point, the letter purports to be written from Nelson's perspective, and then, the author of the letter writes in parentheses, "say my name" (meaning appellant's name) "is locked up." The previous sentence had stated, again from Nelson's perspective, that he was appellant's codefendant. The letter also referred to the author in the first person as going to the hospital, and appellant had gone to the hospital to seek treatment for his gunshot wound.

**{¶255}** The letter further implored Nelson to ensure that his story matched the author's story. The letter emphasized appellant's lack of fault and instructed the recipient to rewrite the story word for word to match the author's version. This story appeared to blame the "dude from UC" for the victim's death. The sergeant stated that officers believed that the "dude from UC" referred to Richard Walker and that "UC" meant the University of Charleston. The letter also included a description of Walker and stressed the urgency of contacting the appellant's lawyer to provide testimony to help save appellant

from a life sentence.  The letter concluded with instructions to burn the letter after reading it.

**{¶256}** We find nothing in the sergeant's testimony to indicate that the jury should have disregarded the letter or determined that the State had not sufficiently established that appellant wrote it.  As we noted above, the letter's contents contained multiple indicators that appellant wrote it and wanted Nelson to tell a story that would prevent appellant from serving a life sentence in prison.  *See Gaines*, 2003-Ohio-6855, at ¶ 12 (8th Dist.); *see generally Giles*, 2021-Ohio-2865, at ¶ 26-37 (6th Dist.); *State v. Williams*, 2021-Ohio-443, ¶ 47, 54 (5th Dist.) (letter properly authenticated when evidence showed that an unsigned note used the "first person to refer to the defendant in the trial, who could only be [the defendant]," and discussed the details of the defendant's trial and the events that occurred on the day of the shooting).

**{¶257}** Moreover, during closing arguments, defense counsel did not appear to dispute that appellant wrote the letters.  He instead suggested that the letters indicated that appellant was

not guilty and that he was "a scared kid sitting in jail charged with a murder he didn't commit." Defense counsel proposed that appellant had been "[r]eaching out in fear . . . and telling those people you better come forward and help me and tell the damn truth about it."

{¶258} Furthermore, both Agent Jenkins and Sergeant Stewart explained how they obtained the letters. Agent Jenkins stated that a corrections officer from the jail sent him via email a letter and an envelope. Sergeant Stewart explained that he obtained the letter from Nelson's mother. Even if the officers did not obtain the letters directly from appellant, appellant has not cited any authority that indicates that law enforcement officers must obtain evidence directly from a defendant in order to link the evidence to the defendant. The jury heard all of the evidence that explained how the officers came to be in possession of the letters, along with the contents of the letters, which strongly indicated that appellant wrote the letters.

**{¶259}** Based upon the foregoing, we do not believe that the jury clearly lost its way by choosing to believe that appellant wrote the letters.

**E**

**Conclusion**

**{¶260}** In sum, our review of the record does not support appellant's argument that the record fails to contain sufficient evidence to support his conviction or that his conviction is against the manifest weight of the evidence. The State presented substantial evidence to establish, beyond a reasonable doubt, that appellant purposely caused the victim's death. For instance, the State's evidence shows, inter alia, the following: (1) appellant's DNA was located at the crime scene; (2) a few hours after the victim's murder, appellant appeared at a hospital with a gunshot wound; (3) at the hospital, appellant gave personnel a false name and stated that he had been shot at a party he had attended in Charleston, West Virginia; (4) Charleston police were unable to find any evidence to corroborate appellant's statement that he had been shot while

attending a party; (4) the bullet recovered from appellant's wound matched a bullet recovered from the victim; (5) appellant wrote incriminating letters that implored one of his codefendants to testify that appellant did not shoot the victim and to blame the victim's murder on the "dude from UC," i.e., Walker; (6) Walker testified that appellant planned to kill the victim; (7) Walker stated that on the date of the victim's murder, he, Nelson, and appellant drove to the victim's home; (8) once at the victim's home, appellant retrieved a shotgun from the vehicle; (9) Nelson shot the victim with the .45-caliber weapon and also accidentally shot appellant; (10) after Nelson shot the victim, Walker and Nelson ran to the car, while appellant remained behind; and (11) Walker testified that appellant fired two shotgun blasts.

**{¶261}** Even if the State's evidence had some gaps, some witnesses had credibility issues, or the evidence collection was not perfect, these gaps, credibility issues, and imperfections do not indicate that this case is an "'"exceptional case in which the evidence weighs heavily against the conviction,"'"

*State v. McKelton*, 2016-Ohio-5735, ¶ 330, quoting *Thompkins*, 78 Ohio St.3d at 387*,* quoting *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717; *see generally United States v. Hasting*, 461 U.S. 499, 508 (1983) ("there can be no such thing as an error-free, perfect trial").

**{¶262}** Accordingly, based upon the foregoing reasons, we overrule appellant's sixth assignment of error.

**V**

**Seventh Assignment of Error**

**{¶263}** In his seventh assignment of error, appellant argues that he did not receive the effective assistance of counsel. He asserts that trial counsel was ineffective for failing to (1) file a written motion for a change of venue, (2) preserve an argument that the jury was not composed of a fair cross section of the community, (3) object to references to appellant's incarceration, (4) object to narrative testimony and allegedly improper opinion testimony, and (5) object to the trial court's questioning of jurors and witnesses. As explained below, we do not find any merit to appellant's arguments.

**A**

**Ineffectiveness Standard**

{¶264} The Sixth Amendment to the United States Constitution, and Article I, Section 10 of the Ohio Constitution, provide that defendants in all criminal proceedings shall have the assistance of counsel for their defense.  The United States Supreme Court has generally interpreted this provision to mean a criminal defendant is entitled to the "reasonably effective assistance" of counsel.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *accord Hinton v. Alabama*, 571 U.S. 263, 272 (2014) (the Sixth Amendment right to counsel means "that defendants are entitled to be represented by an attorney who meets at least a minimal standard of competence").

{¶265} To establish constitutionally ineffective assistance of counsel, a defendant must show that (1) trial counsel's performance was deficient and (2) the deficient performance prejudiced the defense and deprived the defendant of a fair trial.  *E.g., Strickland*, 466 U.S. at 687; *State v. Myers*, 2018-Ohio-1903, ¶ 183; *State v. Powell*, 2012-Ohio-2577, ¶ 85.

"Failure to establish either element is fatal to the claim." *State v. Jones*, 2008-Ohio-968, ¶ 14 (4th Dist.). Therefore, if one element is dispositive, a court need not analyze both. See *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000) (a defendant's failure to satisfy one of the ineffective-assistance-of-counsel elements "negates a court's need to consider the other"); *see also Strickland*, 466 U.S. at 700 ("Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim.").

{¶266} The deficient performance part of an ineffectiveness claim "is necessarily linked to the practice and expectations of the legal community: 'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010), quoting *Strickland*, 466 U.S. at 688; *accord Hinton*, 571 U.S. at 273. Prevailing professional norms dictate that "a lawyer must have 'full authority to manage the conduct of the trial.'" *State v. Pasqualone*, 2009-Ohio-315, ¶ 24, quoting *Taylor v. Illinois*, 484 U.S. 400, 418 (1988).

**{¶267}** Furthermore, "'[i]n any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.'" *Hinton*, 571 U.S. at 273, quoting *Strickland*, 466 U.S. at 688. Accordingly, "[i]n order to show deficient performance, the defendant must prove that counsel's performance fell below an objective level of reasonable representation." *State v. Conway*, 2006-Ohio-2815, ¶ 95.

**{¶268}** Moreover, when considering whether trial counsel's representation amounts to deficient performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Thus, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* Additionally, "[a] properly licensed attorney is presumed to execute his duties in an ethical and competent manner." *State v. Taylor*, 2008-Ohio-482, ¶ 10 (4th Dist.), citing *State v. Smith*, 17 Ohio St.3d 98, 100 (1985). Therefore, a defendant

bears the burden to show ineffectiveness by demonstrating that counsel's errors were "so serious" that counsel failed to function "as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687; *e.g.*, *State v. Gondor*, 2006-Ohio-6679, ¶ 62; *State v. Hamblin*, 37 Ohio St.3d 153, 156 (1988).

{¶269} To establish prejudice, a defendant must demonstrate that a reasonable probability exists that "'but for counsel's errors, the result of the proceeding would have been different.'" *Hinton*, 571 U.S. at 275, quoting *Strickland*, 466 U.S. at 694; *e.g.*, *State v. Short*, 2011-Ohio-3641, ¶ 113; *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus; *accord State v. Spaulding*, 2016-Ohio-8126, ¶ 91 (prejudice component requires a "but for" analysis). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011), quoting *Strickland*, 466 U.S. at 694. This reasonable-probability standard requires a "substantial" likelihood of a different result and not simply a "conceivable"

likelihood of a different result.  *Harrington v. Richter*, 562

U.S. 86, 111 (2011) ("In assessing prejudice under *Strickland*,

the question is not whether a court can be certain counsel's

performance had no effect on the outcome or whether it is

possible a reasonable doubt might have been established if

counsel acted differently.").  Furthermore, courts ordinarily

may not simply presume the existence of prejudice but instead

must require a defendant to affirmatively establish prejudice.

*State v. Clark*, 2003-Ohio-1707, ¶ 22 (4th Dist.); *State v.*

*Tucker*, 2002 WL 507529 (4th Dist. Apr. 2, 2002); *accord State v.*

*Powell*, 2012-Ohio-2577, ¶ 86 (purely speculative argument cannot

serve as the basis for ineffectiveness claim).

**B**

**Motion to Change Venue**

{¶270} Appellant first argues that trial counsel was

ineffective for failing to file a written motion to support his

oral motion to change venue.  He asserts that trial counsel

should have submitted a written motion that included "news

articles, social media posts, pictures of shirts and bumper

stickers[,] and other evidence." Appellant suggests that if defense counsel had submitted written evidence of pretrial publicity, then a reasonable probability exists that the trial court would have determined that pretrial publicity was so pervasive and prejudicial that an attempt to seat a jury would be a vain act. We do not agree.

{¶271} In the case at bar, defense counsel's voir dire questioning ensured that the trial court was well aware of pretrial publicity. The prosecutor and defense counsel specifically asked prospective jurors about their exposure to the different types of pretrial publicity that had appeared in the community, including news broadcasts, social media posts, and "Justice for [K.R.]" signs, bumper stickers, and shirts. These questions thus made the trial court well aware of the pretrial publicity that existed in the community. Even if defense counsel did not submit written proof of the pretrial publicity, defense counsel's failure to do so was not objectively unreasonable given counsel's targeted questions regarding pretrial publicity.

{¶272} Additionally, even if counsel's performance was deficient, appellant has not established a reasonable probability that the trial court would have presumed prejudice and changed venue if counsel had submitted written evidence of pretrial publicity. *See State v. Cunningham*, 2004-Ohio-7007, ¶ 97 (concluding that defendant failed to establish that defense counsel provided ineffective assistance of counsel by failing to submit written evidence of pretrial publicity when voir dire questioning made trial court "well aware of the extent of media coverage and pretrial publicity"). Thus, counsel's failure to document the pretrial publicity through the use of newspaper articles, social media posts, and the like did not prejudice appellant. *See State v. Davis*, 2008-Ohio-2, ¶ 50 ("The trial court was well aware of the extent of pretrial publicity because many prospective jurors acknowledged that they had heard something about the case. Thus, [the defendant] has failed to show how trial counsel's failure to submit newspaper clippings and other media stories was prejudicial."); *State v. Froman*, 2022-Ohio-2726, ¶ 77 (12th Dist.) ("the trial court was aware of

the pretrial publicity about [the defendant]'s case, and the mere fact that trial counsel failed to submit some published articles about the case in support of [the defendant]'s motion for a change of venue does not, by itself, amount to ineffective assistance"); *State v. McKnight*, 2008-Ohio-2435, ¶ 31 (4th Dist.), citing *State v. Moreland*, 2000 WL 5933, *8 (2d Dist. Jan. 7, 2000) ("counsel's failure to include every piece of publicity surrounding a case does not amount to ineffective assistance of counsel when the trial court is well aware of the level of publicity).

**{¶273}** We also note that fully evaluating the impact of submitting written evidence of pretrial publicity depends upon evidence that is not in the record. "On direct appeal, we are restricted to facts that are apparent in the record." *State v. Russell*, 2009-Ohio-5145, ¶ 26 (4th Dist.), citing *State v. Davis*, 2007-Ohio-3944, ¶ 19 (4th Dist.). "A reviewing court cannot add matter to the record before it, which was not a part of the trial court's proceedings." *State v. Ishmail*, 54 Ohio St.2d 402 (1978), paragraph one of the syllabus. Thus,

ineffectiveness claims that depend upon evidence outside the trial record are not appropriate to consider on direct appeal. Instead, a postconviction action, rather than a direct appeal, is the proper mechanism for asserting an ineffectiveness claim that is based on evidence dehors the record. *See State v. Blanton*, 2022-Ohio-3985, ¶ 41, citing *State v. Smith*, 17 Ohio St.3d 98, 101, fn. 1 (1985) ("claims that rely on evidence outside the record may be heard on postconviction review"); *State v. Cooperrider*, 4 Ohio St.3d 226, 228 (1983) (postconviction procedure appropriate when ineffectiveness claims "are based on facts not appearing in the record"); *State v. Burchfield*, 2025-Ohio-867, ¶ 14 (4th Dist.) (considering evidence outside of the record "is not appropriate in a direct appeal"); *State v. Weathersbee*, 2019-Ohio-5307, ¶ 29 (11th Dist.) (an ineffective-assistance claim that is based on evidence dehors the record cannot be reviewed on direct appeal); *State v. Curtis*, 2008-Ohio-916, ¶ 8 (8th Dist.) ("The law is well-settled that when allegations of ineffective assistance of counsel hinge

on facts not appearing in the record, the proper remedy is a petition for postconviction relief rather than direct appeal.").

{¶274} Consequently, we cannot conclude that trial counsel was ineffective for failing to file a written motion to change venue with documents to illustrate the extent of pretrial publicity.

C

**Fair Cross Section**

{¶275} Next, appellant contends that trial counsel was ineffective for failing to assert that trying his case in Meigs County would violate the fair-cross-section requirement under the Sixth Amendment to the United States Constitution. Appellant argues that trial counsel should have raised this issue before trial and requested an evidentiary hearing. Appellant claims that a hearing would have allowed counsel to present evidence regarding the demographics of Meigs County and to establish that African American citizens were systemically excluded.

{¶276} The State asserts that nothing in the record indicates the "systematic exclusion of African Americans in the jury-selection process."

{¶277} Appellant counters that the lack of evidence in the record means that this court cannot determine whether African Americans were systemically excluded. Appellant observes that the State claims that including two African Americans in the jury venire was "not unfair or unreasonable given the Meigs County population." Appellant responds: "That unsupported claim is exactly the problem; we do not know because defense counsel failed to file a proper motion and attach proper documentation. Appellee is simply speculating."

{¶278} "[T]he selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975). Thus, "the Sixth Amendment affords the defendant in a criminal trial the opportunity to have the jury drawn from venires representative of the community." *Id.* at 537. To establish a violation of the fair-cross-section

requirement, a defendant must demonstrate all of the following:

(1) "the group alleged to be excluded is a 'distinctive' group

in the community"; (2) "the representation of this group in

venires from which juries are selected is not fair and

reasonable in relation to the number of such persons in the

community"; and (3) "this underrepresentation is due to

systematic exclusion of the group in the jury-selection

process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979); *accord*

*Berghuis v. Smith*, 559 U.S. 314, 327 (2010). The second part of

this test requires the defendant to "demonstrate the percentage

of the community made up of the group alleged to be

underrepresented, for this is the conceptual benchmark for the

Sixth Amendment fair-cross-section requirement." *Duren*, 439

U.S. at 364. Under the third part of the test, a defendant

"must do more than show that his particular panel was

unrepresentative." *State v. Jones*, 91 Ohio St.3d 335, 339-41

(2001); *State v. McNeill*, 83 Ohio St.3d 438, 444 (1998)

("underrepresentation on a single venire is not *systematic*

exclusion" [emphasis in original]).

**{¶279}** In the case at bar, even if defense counsel performed deficiently by failing to properly preserve the issue, appellant cannot demonstrate a reasonable probability that the trial court would have found a violation of the fair-cross-section requirement. Had appellant's counsel raised the issue, the trial court likely would have concluded that appellant satisfied the first part of the *Duren* test: "For purposes of [a] fair-cross-section analysis, African-Americans are a distinctive group." *State v. Jones*, 91 Ohio St.3d 335, 340 (2001).

**{¶280}** A reasonable probability does not, however, exist that the trial court would have concluded that appellant established the second and third parts of the *Duren* test. Appellant has not pointed to any evidence that documents (1) the percentage of African Americans in Meigs County or (2) the systematic exclusion of African Americans from the jury-selection process used in Meigs County. *See State v. Jones*, 2024-Ohio-4538, ¶ 61 (3d Dist.), citing *State v. Purvis-Mitchell*, 2018-Ohio-4032, ¶ 77 (4th Dist.) (both rejecting ineffectiveness claims based upon failure to properly raise fair-cross-section issue when the

record did not contain any evidence to support allegations that African Americans were underrepresented or systemically excluded); *see generally Duren*, 439 U.S. at 366 (finding systemic exclusion when "discrepancy between the percentage of women in jury venires and the percentage of women in the community" occurred "not just occasionally, but in every weekly venire for a period of nearly a year").

**{¶281}** Furthermore, to the extent that appellant's argument relies on evidence outside the record, we again note that on direct appeal, this court is limited to the record and cannot add any material to it. *See State v. Harris*, 2002-Ohio-2411, ¶ 31 (7th Dist.) (stating that ineffectiveness claim based upon failure to preserve fair-cross-section issue that relies upon evidence outside of the record may be an appropriate matter to raise in a postconviction petition).

**{¶282}** Consequently, based upon the record before us, we cannot conclude that trial counsel was ineffective for failing to properly preserve the fair-cross-section issue.

**D**

## Failure to Object to Jail References

**{¶283}** Appellant next argues that trial counsel was ineffective for failing to object to the following testimony regarding his pretrial incarceration: (1) appellant's ex-girlfriend testified that appellant called her from jail; (2) Deputy Spiker testified that he retrieved appellant from jail to take him to the hospital to have the bullet removed from his arm; and (3) Sergeant Stewart testified that he received letters that appellant sent from jail. He contends that counsel's failure to object to these statements eroded his presumption of innocence and prejudiced the jury against him. Appellant claims that the references to his pretrial incarceration "left the jury with the impression he must be guilty if he was still locked up" and "gave the jury the impression that he was a dangerous person who needed to be locked up because he was guilty of the crime for which he was on trial."

**{¶284}** The State argues that defense counsel was not ineffective for failing to object to the foregoing references to appellant's pretrial incarceration. The State contends that

Deputy Spiker's testimony that he retrieved appellant from jail and drove him to the hospital helped explain why appellant did not drive himself to the hospital. The State asserts that testimony that appellant sent letters from jail helped authenticate the letters and establish a chain of custody for the letters. The State further argues that appellant cannot establish a reasonable probability that the outcome of the trial would have been different if trial counsel had objected to the foregoing testimony.

{¶285} We initially observe that trial counsel's "failure to make objections is not alone enough to sustain a claim of ineffective assistance of counsel." *State v. Conway*, 2006-Ohio-2815, ¶ 103; *accord State v. Sowell*, 2016-Ohio-8025, ¶ 144 (rejecting argument that failing to preserve error is inherently prejudicial and stating, "[i]t is not enough that an alleged error resulted in a disadvantage for an accused"). Instead, a defendant still must "show that any particular failure to object substantially violated an[] essential duty [and] was prejudicial." *State v. Fears*, 86 Ohio St.3d 329, 347 (1999);

*accord State v. Holloway*, 38 Ohio St.3d 239, 244 (1988) (stating

that failure to object insufficient on its own to establish

ineffective assistance of counsel; instead, a defendant still

must demonstrate that counsel substantially violated an

essential duty and that counsel's performance materially

prejudiced the defense).

{¶286} Additionally, trial counsel's decision to object, or

not to object, may be a legitimate trial strategy or tactical

decision for the reason that "'each potentially objectionable

event could actually act to [the defendant]'s detriment.'"

*State v. Johnson*, 2006-Ohio-6404, ¶ 140, quoting *Lundgren v.*

*Mitchell*, 440 F.3d 754, 774 (C.A. 6, 2006).  Thus,

> any single failure to object usually cannot be said to
> have been error unless the evidence sought is so
> prejudicial . . . that failure to object essentially
> defaults the case to the state.  Otherwise, defense
> counsel must so consistently fail to use objections,
> despite numerous and clear reasons for doing so, that
> counsel's failure cannot reasonably have been said to
> have been part of a trial strategy or tactical choice.

*Id.*, quoting *Lundgren*, 440 F.3d at 774; *cf. United States v.*

*Cronic*, 466 U.S. 648, 656 (1984) (describing the right to the

effective assistance of counsel as "the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing"). We further recognize, however, that testimony regarding a defendant's incarceration generally is not proper and is "potentially prejudicial because [it] erode[s] the presumption of innocence, for the same reason that wearing prison or jail clothing does." *State v. Stoermer*, 2018-Ohio-4522, ¶ 35 (2d Dist.).

**{¶287}** In the case at bar, defense counsel may have determined that not objecting to each reference to appellant's pretrial incarceration was a reasonable strategy designed to minimize the impact of the testimony. *See State v. Jones*, 2015-Ohio-4116, ¶ 68 (2d Dist.) ("Not objecting to testimony is a reasonable trial strategy that counsel may use to avoid attracting a jury's attention to a matter.").

**{¶288}** Furthermore, even if counsel had objected, appellant has not established a reasonable probability that the outcome of the trial would have been different. If the jury had not heard testimony that appellant was in jail before trial, as we

explained in our discussion of appellant's sixth assignment of error, the remaining evidence constitutes ample evidence of appellant's guilt.  Thus, any deficient performance did not prejudice appellant.

**{¶289}** Moreover, "[e]ven if defense counsel did not perform as perfectly as appellant would have preferred, the Sixth Amendment right to counsel does not guarantee an error-free, perfect trial, but simply, a fair trial, i.e., one whose result was reliable."  *State v. Carroll*, 2016-Ohio-7218, ¶ 35 (4th Dist.), citing *In re Smith*, 2001 WL 1627641 (4th Dist. Dec. 12, 2001), quoting *United States v. Hasting*, 461 U.S. 499, 508-509 (1983) ("'there can be no such thing as an error-free, perfect trial, and . . . the Constitution does not guarantee such a trial.'"); *cf. Cronic*, 466 U.S. at 659 (explaining that trial is unfair "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing").

**{¶290}** Consequently, we do not agree with appellant that trial counsel was ineffective for failing to object to testimony regarding his pretrial incarceration.

**E**

**Failure to Object to Narrative and Opinion Testimony**

**{¶291}** Appellant next contends that trial counsel was ineffective for failing to object to narrative and opinion testimony.  He argues that his ex-girlfriend offered irrelevant and speculative testimony when she stated that (1) after she spoke with appellant after the murder, "her first instinct was that [appellant] did it" and (2) she "assumed" that appellant knew that she had been "messing around with" the victim.

**{¶292}** Appellant further asserts that Agent Jenkins testified in "narrative form for pages and pages before defense counsel finally uttered an objection, which was sustained but not stricken."  Appellant claims that "Agent Jenkins basically reiterated the entire investigation, even where he did not have firsthand knowledge."  Appellant argues that Agent Jenkins "repeated irrelevant but prejudicial victim impact hearsay from [the victim]'s parents about how well liked in the community he was, how he was a star athlete, and how everyone wanted to be around him."  He additionally complains that Agent Jenkins

summarized Runyon and appellant's relationship even though he lacked firsthand knowledge.

{¶293} Appellant next contends that the trial court improperly allowed Agent Jenkins to offer his lay opinion regarding appellant's reasons for writing the letter.

{¶294} Appellant additionally claims that Deputy Barnhart offered speculative and improper lay opinion testimony. Appellant argues that Deputy Barnhart repeated hearsay from appellant's "mother and sister that [appellant] went to Maryland after the incident, which in his opinion made [appellant] a suspect."

{¶295} Appellant also states that the deputy offered improper opinion testimony when he stated that people do not normally turn off their phone "for a set period and then turn it back on," but instead turn their phones off "when they have something to hide."

{¶296} In addition, appellant contends that Sergeant Stewart offered improper opinion testimony when he testified that appellant authored the letters.

{¶297} Appellant asserts that the foregoing allegedly improper testimony "allowed the prosecution to bolster other witnesses with testimony from those who had no foundation" and who "relied on hearsay and speculation."  He contends that these witnesses testified "to the ultimate issue for the jury." Appellant thus contends that trial counsel performed deficiently by failing to object to the testimony and that this failure to object prejudiced his right to a fair trial.

**1**

**Narrative Testimony**

{¶298} In the case at bar, we initially observe that appellant does not cite any authority to suggest that narrative testimony is inadmissible or that defense counsel provides ineffective assistance of counsel by failing to object to narrative testimony or by failing to ask the court to strike narrative testimony.  Appellant's failure to cite legal authority means that we could summarily reject this argument. *See In re Application of Columbus S. Power Co.*, 2011-Ohio-2638, ¶ 14 (failure to cite legal authority or present argument that a

legal authority applies is grounds to reject a claim); *Robinette v. Bryant*, 2015-Ohio-119, ¶ 33 (4th Dist.) (court has "discretion to disregard any assignment of error that fails to present any citations to cases or statutes in support"); *see also State v. Holloway*, 2024-Ohio-3189, ¶ 37 (8th Dist.) (court may summarily reject an argument when defendant fails to support it "with any legal authority demonstrating error"); *Frye v. Holzer Clinic, Inc.*, 2008-Ohio-2194, ¶ 12 (4th Dist.) (court "may disregard any assignment of error that fails to present any citations to case law or statutes in support of its assertions").

**{¶299}** We further observe that defense counsel did object to Agent Jenkins's testimony on the basis that it constituted narrative testimony rather than responses to specific questions. The trial court then instructed Agent Jenkins to wait for the prosecutor to ask questions rather than testifying in narrative format. Thus, appellant cannot claim that counsel was deficient for failing to object to this testimony when the record establishes that counsel did.

{**¶300**} We also observe that "[t]rial courts have considerable discretion under Evid.R. 611(A) with respect to the method and mode by which evidence is introduced in a proceeding." *State v. Williams*, 1998 WL 290240, *5 (4th Dist. May 18, 1998). Evid.R. 611(A) explicitly gives trial courts "reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to . . . make the interrogation and presentation effective for the ascertainment of the truth. . ." Trial courts thus have discretion "'to control the form of examination to the end that the facts may be clearly and expeditiously presented" and "'may permit either'" narrative testimony or testimony in response to specific questions. *Seventh Urban, Inc. v. Ann's Wig Shop.*, 1980 WL 354666, *4 (8th Dist. Apr. 24, 1980), quoting McCormick, *Evidence*, § 5 at 8 (2d Ed. 1972); *see* Giannelli, *Ohio Evidence*, § 611.3 (4th ed.) ("Testimony may be elicited by specific interrogation (question and answer) or by free narrative"); *United States v. Beckton*, 740 F.3d 303, 306 (4th Cir. 2014) ("[q]uestions of trial management are quintessentially" within trial courts' "province").

{¶301} Because trial courts have discretion to allow narrative testimony, appellant cannot establish that defense counsel's decision not to ask the court to strike Agent Jenkins's narrative testimony was objectively unreasonable.

{¶302} Furthermore, even if counsel performed deficiently by failing to ask the court to strike Agent Jenkins's narrative testimony, appellant cannot establish a reasonable probability that the outcome of the trial would have been different if counsel had made this request. If the trial court had decided to strike the testimony, then the State may have obtained the same essential testimony by engaging in a question-and-answer format.

{¶303} We therefore do not believe that appellant can establish that trial counsel was ineffective for failing to object to, or to ask the court to strike, Agent Jenkins's narrative testimony.

**2**

**Opinion Testimony**

{¶304} Appellant additionally asserts that trial counsel was ineffective for failing to object to improper lay opinion testimony.

{¶305} As with his argument regarding narrative testimony, appellant fails to cite any authority to support his argument that Runyon, Agent Jenkins, Deputy Barnhart, or Sergeant Stewart gave improper opinion testimony or that defense counsel provides ineffective assistance of counsel by failing to object to testimony of a similar nature.  Appellant's failure to cite legal authority means that we could summarily reject this argument.  Nevertheless, in the interest of justice, we briefly address it.

{¶306} Evid.R. 701 permits a nonexpert witness to offer "testimony in the form of opinions or inferences" if those opinions or inferences "are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."  If a lay witness's opinion is not "rationally based upon first-hand perceptions by the witness," "the opinion

194

is speculation, and as such cannot be 'helpful to a . . . determination of a fact in issue.'"  *State v. Hall*, 2004-Ohio-663, ¶ 8 (2d Dist.), quoting Evid.R. 701.

{¶307} In the case at bar, even if trial counsel performed deficiently by failing to object to the allegedly improper opinion testimony, appellant cannot establish a reasonable probability that the outcome of the trial would have been different if counsel had objected.  Even if the trial court had agreed that the witnesses offered improper lay opinion testimony and had instructed the jury to disregard that testimony, as we explained in our discussion of appellant's sixth assignment of error, the record otherwise contains ample evidence to establish appellant's guilt.  Thus, trial counsel's failure to object did not prejudice appellant.  Appellant thus cannot establish that trial counsel failed to provide the effective assistance of counsel by failing to object to the allegedly improper opinion testimony.

**3**

**Failure to Object to the Court Asking Questions**

{¶308} Appellant further argues that trial counsel was ineffective for failing to object to questions that the court asked Deputy Dillard.  Appellant observes that the court asked Dillard "whether any of the evidence Dillard took out of the evidence locker for trial . . . appeared to have been tampered, destroyed, or mutilated or changed in any way."  Dillard stated that it had not.  Appellant claims that the court's question and Dillard's answer "made the very important and critical point for the State, a point the prosecution had not brought out prior to the trial court's question.  It established that the evidence was as it was when it was collected."  Appellant asserts that "[t]he trial court destroyed [appellant's] defense by obtaining crucial testimony that the evidence was not tampered, destroyed, mutilated or changed."  He thus contends that trial counsel should have objected and asked the court to strike the deputy's testimony.

{¶309} Evid.R. 614(B) allows a trial court to "interrogate witnesses, in an impartial manner, whether called by itself or by a party."  The rule "'exists because the trial court has an

196

"obligation to control proceedings, to clarify ambiguities, and to take steps to insure substantial justice."'" *State v. Skerkavich*, 2019-Ohio-4973, ¶ 13 (8th Dist.), quoting *State v. Stadmire*, 2003-Ohio-873, ¶ 26 (8th Dist.), quoting *State v. Kay*, 12 Ohio App.2d 38, 49 (8th Dist. 1967).  Under this rule, "a trial court is permitted to question witnesses called by a party as long as the questions are relevant and the questioning is done impartially."  *In re Myers*, 2004-Ohio-539, ¶ 8 (3d Dist.).

{¶310} Additionally, under Evid.R. 611(A), the trial court "has discretion to control the flow of the trial" and may ask witnesses questions "in a search for truth."  *State v. Prokos*, 91 Ohio App.3d 39, 44 (4th Dist.1993), citing Evid.R. 614; *accord State v. Redon*, 2009-Ohio-5966, ¶ 8 (8th Dist.).  Accordingly, "[t]he right to question a witness, pursuant to Evid.R. 614(B), rests within the sound discretion of the trial court."  *State v. Vanloan*, 2009-Ohio-4461, ¶ 8 (12th Dist.).

{¶311} In the case at bar, even if trial counsel performed deficiently by failing to object to the trial court's questioning of Deputy Dillard, we do not agree with appellant

that this failure affected the outcome of the case. Defense counsel argued to the jury that the State mishandled evidence and that the jury should not rely upon the evidence. Moreover, even without Deputy Dillard's response to the court's questioning, the record still contains ample evidence of appellant's guilt. Therefore, appellant cannot establish that trial counsel was ineffective for failing to object to the court's questions.

**F**

**Conclusion**

{¶312} Accordingly, based upon the foregoing reasons, we overrule appellant's seventh assignment of error.

**VI**

**Eighth Assignment of Error**

{¶313} In his eighth assignment of error, appellant argues that the prosecutor committed misconduct that deprived him of his constitutional rights to due process and to a trial by an impartial jury. Appellant alleges that the prosecutor engaged in misconduct by (1) introducing, during opening statements,

irrelevant and prejudicial victim-impact evidence; (2) vouching for Walker's credibility by (a) explaining the prosecutor's thought process when offering him a plea deal and (b) suggesting that the crime scene evidence supported Walker's story; (3) arguing that Nelson (a) gave law enforcement officers information that led to Walker's arrest and (b) helped them with the letters that appellant allegedly wrote while incarcerated; and (4) by commenting on appellant's privilege against self-incrimination.

**A**

**Prosecutorial Misconduct**

{¶314} "Prosecutorial misconduct constitutes reversible error only in rare instances." *State v. Edgington*, 2006-Ohio-3712, ¶ 18 (4th Dist.), citing *State v. Keenan*, 66 Ohio St.3d 402, 405 (1993). Accordingly, courts ordinarily will not reverse a judgment on the basis of prosecutorial misconduct unless "the prosecutor's conduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *State v. Belton*, 2016-Ohio-1581, ¶ 125, quoting *Donnelly v.*

*DeChristoforo*, 416 U.S. 637, 643 (1974). A prosecutor's improper conduct "'so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process'" when "it prejudicially affect[s] the defendant's substantial rights." *State v. Wilks*, 2018-Ohio-1562, ¶ 172, citing *State v. Maxwell*, 2014-Ohio-1019, ¶ 243. Courts assess prejudice by examining "the effect of the misconduct '. . . in the context of the entire trial.'" *Wilks* at ¶ 172, quoting *Keenan*, 66 Ohio St.3d at 410.

{¶315} We further note that "[t]he benchmark of the prosecutorial misconduct analysis is 'the fairness of the trial, not the culpability of the prosecutor.'" *State v. Obermiller*, 2016-Ohio-1594, ¶ 99, quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982). Accordingly, "[n]ot every intemperate remark by counsel can be a basis for reversal." *State v. Landrum*, 53 Ohio St.3d 107, 112 (1990). Instead, "[t]he test for prosecutorial misconduct is whether the conduct complained of deprived the defendant of a fair trial." *State v. Jackson,* 92 Ohio St.3d 436, 441 (2001), citing *State v. Apanovitch*, 33 Ohio St.3d 19,

24 (1987). Therefore, "[t]he touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Garrett*, 2022-Ohio-4218, ¶ 144, quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

**{¶316}** In the case at bar, appellant recognizes that trial counsel did not object to the prosecutor's (1) opening statement regarding the victim's background, (2) statements allegedly vouching for Walker's credibility, or (3) comments regarding Nelson's involvement. He thus agrees that plain-error review applies to these alleged instances of prosecutorial misconduct. We therefore review these claims to determine whether the prosecutor obviously engaged in misconduct so as to affect the outcome of the trial. *See State v. Whitaker*, 2022-Ohio-2840, ¶ 85 (defendant's failure to contemporaneously object to alleged prosecutorial misconduct forfeits all but plain error).

**{¶317}** Appellant did, however, object when he believed that the prosecutor improperly commented upon appellant's privilege against self-incrimination. This prosecutorial misconduct claim thus is not subject to plain-error review.

**B**

**Victim-impact Evidence**

**{¶318}** Appellant first argues that the prosecutor engaged in misconduct by introducing victim-impact evidence during opening statement.  Appellant asserts that the prosecutor "should not have commented on what type of person [the victim] was."  He claims that the prosecutor's comments about the victim's character served only to generate "sympathy" for the victim and "anger" toward appellant.

**{¶319}** The State contends that opening statements are not evidence and further asserts that the prosecutor's opening statement did not contain any improper victim-impact evidence.

**{¶320}** "Opening statements serve to inform the jury about the nature of the case and to outline the facts that each party *intends to prove.*"  (Emphasis in original) *State v. Nicholson*, 2024-Ohio-604, ¶ 282.  "Prosecutors have wide latitude in opening statement but cannot use that opportunity to introduce evidence."  *State v. Fannon*, 2018-Ohio-5242, ¶ 58 (4th Dist.). The prosecution may, however, "refer to evidence it intends to

present during trial." *State v. Gilbert*, 2005-Ohio-5536, ¶ 16 (10th Dist.). The prosecution thus may "summarize," "describe," or "anticipate evidence," but it "risks a mistrial when it engages in an attempt to actually introduce evidence." *Id.*

{¶321} Moreover, "opening statements should not include matters that attempt to influence or sway the jury by making statements that counsel knows will not be supported by competent or admissible evidence." *State v. Wuensch*, 2017-Ohio-9272, ¶ 34 (8th Dist.), citing *Maggio v. Cleveland*, 151 Ohio St. 136, 140–141 (1949). However, "unless . . . counsel 'deliberately attempt[ed] to influence and sway the jury by a recital of matters foreign to the case,' remarks made during opening statements cannot form the basis of a misconduct claim." *Nicholson*, 2024-Ohio-604, at ¶ 282, quoting *Maggio* at paragraph two of the syllabus.

{¶322} As we determined in our discussion of appellant's fifth assignment of error, the prosecutor's opening statement did not reference improper victim-impact testimony. For this reason, we cannot state that the trial court obviously erred by

not sua sponte striking as prosecutorial misconduct the prosecutor's opening statement that gave the jury background information about the victim.

**{¶323}** We further note that the trial court instructed the jury that opening statements are not evidence. The court informed the jury that each party begins with an opening statement that "outlines what they expect their evidence will be." The court specifically advised the jury that opening statements "will not be evidence." The court continued to explain that opening statements "are a preview of the claims of each party designed to help [the jury] follow the evidence as it is presented."

**{¶324}** Under these circumstances, we cannot state that the prosecutor committed misconduct during opening statement by giving the jury context and background information about the victim, especially when the State presented evidence to support the assertions contained in its opening statement. *See Nicholson*, 2024-Ohio-604, at ¶ 283 (concluding that defendant failed to show plain error when the trial court had instructed

204

the jury that opening statements are not evidence and when the evidence supported the assertions that the defendant claim constituted misconduct).

**C**

**Vouching for Witnesses**

**{¶325}** Appellant also contends that the prosecutor improperly vouched for Walker's credibility. Appellant complains that the prosecutor "inject[ed] himself and his credibility into the case" when the prosecutor "emphasized" that offering Walker a plea deal "was his decision" and that he would not have offered Walker a deal if the prosecutor thought that Walker was lying.

**{¶326}** Appellant additionally asserts that the prosecutor's statement that he "consulted the victim's parents and law enforcement officers" before accepting Walker's plea deal gave Walker's testimony credibility by suggesting that "others approved" using Walker's testimony at trial.

**{¶327}** Appellant further argues that the prosecutor committed misconduct by stating that the prosecutor agreed to a plea agreement with Walker because the crime scene evidence supported

Walker's story.  Appellant claims that the prosecutor's statements improperly bolstered Walker's credibility.

**{¶328}** As a general matter, a prosecutor may not vouch for a witness by expressing a personal belief or an opinion as to the credibility of a witness.  *State v. Myers*, 2018-Ohio-1903, ¶ 145; *State v. Williams*, 79 Ohio St.3d 1, 12 (1997).  Improper vouching occurs when a prosecutor implies knowledge of facts outside the record or places the prosecutor's personal credibility in issue.  *Myers*, 2018-Ohio-1903, at ¶ 145; *State v. Jackson*, 2005-Ohio-5981, ¶ 117; *State v. Keene*, 81 Ohio St.3d 646, 666 (1998).  By preventing the prosecutor from giving the jury the impression that evidence particularly known to the prosecutor but kept from the jury "supports the charges against the defendant," the rule seeks to avoid jeopardizing a "defendant's right to be tried solely on the basis of the evidence presented to the jury."  *United States v. Young*, 470 U.S. 1, 18 (1985).  Moreover, the rule prohibits prosecutors from expressing their own opinions to avoid inducing "the jury

to trust the Government's judgment rather than its own view of the evidence."  *Id.* at 18-19.

{¶329} Although prosecutors cannot express an opinion regarding the credibility of witnesses or evidence, they may argue that the fact finder should consider "'the character, quality, or consistency of particular evidence or witnesses . . . when assessing credibility.'"  *State v. Hostacky*, 2014-Ohio-2975, ¶ 47 (8th Dist.), quoting *State v. Cody*, 2002-Ohio-7055, ¶ 35 (8th Dist.).  Thus, "[a] prosecutor does not improperly vouch for a witness's credibility by arguing, based upon the evidence, that a witness was 'a reliable witness to the simple events she witnessed, that she lacked any motive to lie, [or] that her testimony was not contradictory.'"  *State v. Reine*, 2007-Ohio-7221, ¶ 63 (4th Dist.), quoting *State v. Green*, 90 Ohio St.3d 352, 373-374 (2000).  Additionally, "[a] prosecutor may argue facts in evidence to support a witness's credibility and may respond to defense attacks on the witness's credibility and mental abilities."  *Id.*, citing *Green*, 90 Ohio St.3d at 374, and *State v. Woodard*, 68 Ohio St.3d 70, 76 (1993).

{¶330} Furthermore, even if a prosecutor improperly vouches for a witness, courts will uphold the conviction when the record indicates "'beyond a reasonable doubt that the jury would have returned a verdict of guilty'" in the absence of the improper remarks. *State v. Knuff*, 2024-Ohio-902, ¶ 238, quoting *United States v. Hasting*, 461 U.S. 499, 511-512 (1983).

{¶331} In the case sub judice, we do not believe that appellant has established that the prosecutor obviously vouched for Walker or that any improper vouching affected his substantial rights. During opening statement, the prosecutor stated the following:

> In order to obtain [Walker]'s cooperation, the State had to claim a deal and that was my decision. I made that decision in consultation with [the victim]'s parents and with law enforcement. Um, the reason the deal was made with [Walker] and not [Nelson] is because the physical evidence at the scene supported [Walker]'s story.

{¶332} The prosecutor's statement that the crime scene evidence supported Walker's testimony did not constitute improper vouching. The assertion did not imply knowledge of facts outside the record or place the prosecutor's own

credibility at issue.  Instead, the prosecutor used facts in evidence-the crime scene evidence-to argue that Walker's testimony was credible.  *See generally State v. Graham*, 2020-Ohio-6700, ¶ 97 (no improper vouching occurred when prosecutor stated that witnesses eventually decided to tell the truth; prosecutor simply "discussed the circumstances leading to [the witnesses'] eventual decision to cooperate with police, and the testimony at trial supported [the prosecutor's] statements"); *id.* at ¶ 99 (prosecutor did not improperly vouch for witnesses when arguing that (1) the witnesses' testimonies were consistent with each other, (2) the victims' testimonies corroborated the witnesses' testimony, and (3) the witnesses "were motivated to tell the truth").

**{¶333}** Moreover, even if the prosecutor's comments that Walker's plea agreement was the prosecutor's decision and that he consulted the victim's parents and law enforcement officers constituted an obvious error that the trial court should have sua sponte struck, *see State v. Waddy*, 63 Ohio St.3d 424, 435-436 (1992) (prosecutor may not "invite[] the jury to substitute

the prosecutor's experience for its own evaluation"), the record does not suggest that these comments affected the outcome of the trial. Rather, given the overwhelming evidence of appellant's guilt, as we discussed in appellant's sixth assignment of error, any improper comments did not affect appellant's substantial rights. *See Knuff*, 2024-Ohio-902, at ¶ 240 (prosecutorial misconduct constitutes harmless error when the record contains "overwhelming evidence of [the defendant]'s guilt"). Viewed in the context of the entire trial, the prosecutor's statements, even if improper, did not "undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." *Young*, 470 U.S. at 16; *see United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 240 (1940) (when the record indicates that improper "statements were minor aberrations in a prolonged trial and not cumulative evidence of a proceeding dominated by passion and prejudice, reversal would not promote the ends of justice").

**{¶334}** Consequently, appellant has not established that we must reverse his conviction based upon the argument that the

prosecutor engaged in misconduct by improperly vouching for

Walker.

**D**

**Improper Argument**

**{¶335}** Appellant next asserts that the prosecutor introduced

improper argument by referring to statements that his

nontestifying codefendant, Nelson, made during interviews with

law enforcement officers.  Appellant contends that *Bruton v.*

*United States*, 391 U.S. 123 (1968), prohibits the prosecution

from introducing a nontestifying codefendant's confession into

evidence, because admitting the nontestifying codefendant's

confession would violate a defendant's right to confront and

cross-examine the witnesses against him.

**{¶336}** Appellant observes that, during opening statements,

the prosecutor stated the following:

> At that time, during those interviews, he was
> denying that he was the person who shot [the victim].
> Now Keontae has not agreed to testify in this case, and
> I won't anticipate that he will testify in this case, so
> I can't really tell you what he said about or did not
> say about the Defendant, but he did say something
> incredibly important during his fourth (4th) interview

that led to the arrest of a third suspect. Keontae claimed that a young man by the name of Richard Walker shot [the victim] with the forty five (45) caliber handgun. Keontae did not state that he shot [the victim] with a shotgun, and he did not state that Richard shot [the victim] with a shotgun, but he did indicate that Richard Walker is the one who shot [the victim] with the forty five (45). Keontae's story of how Richard Walker allegedly shot [the victim], however, did not match the physical evidence at the scene. Nonetheless, agents obtained an arrest warrant for Richard Walker. Richard Walker was arrested, and he also readily agreed to give a statement.

**{¶337}** Appellant further asserts that, during closing argument, the prosecutor stated the following:

[Agent Jenkins's] investigation, along with the Major Crimes Task Force, led to Keontae Nelson. Keontae Nelson gave a total of five separate interviews. Five interviews. Not just five statements at one time, five separate interviews on five different dates. Not until the fourth interview did he reveal any information about Richard Walker. He was holding out as long as he could. He did not want to give up Richard Walker's name. It took four interviews. When he gave up that name, Agent Jenkins and agents from the Task Force tracked down Richard Walker and they interviewed Richard Walker. Prior to that, Keontae had made mention of letters that he had received from the Defendant and Keontae's mother, upon request, provided those letters to law enforcement.

**{¶338}** Appellant contends that the prosecutor's assertions improperly "suggest[ed] that anything Nelson said or did would

be or was evidence when he did not testify." He thus claims that the State could not use this line of argument "as evidence against [him]" and further complains that he did not have any "way to confront or cross-examine this argument."

**{¶339}** Appellant next argues that, during closing argument, the prosecutor improperly referred to two witnesses who did not testify at trial. The prosecutor stated the following:

> [T]wo witnesses that the State had anticipated calling were unavailable to testify. One was Amanda Brumfield with the Middleport Police Department, who is one of the first officers on scene. She was unable to testify due to a medical situation. And Sergeant Fields was unable to testify, um, he is with Charleston Police Department and, if you recall during my opening statement, I said that there would be a video that you could watch, and that was his body cam, um, so we were not able to get that into evidence without his testimony. So, that's why you didn't see that.

**{¶340}** Appellant asserts that because these two witnesses did not testify, "there was no evidence to reference, and it was improper for the prosecutor to explain why the State did not present their testimony."

**{¶341}** The State argues that the prosecutor's statements regarding Nelson were not improper references to a nontestifying

codefendant's confession.  The State instead claims that the statements related the testimony that the prosecution expected from law enforcement officers regarding their investigative efforts.  The State asserts that nothing in the prosecutor's statements suggested that it would introduce evidence or testimony obtained from Nelson.

{¶342} The State next claims that nothing that the prosecutor stated regarding the two witnesses who ultimately did not testify constituted prosecutorial misconduct.  The State indicates that, during its opening statement, the prosecutor informed the jury that these two witnesses would testify and related their expected testimony.  Although the State admits that, during closing argument, explaining the witnesses' absence may not have been necessary, it does not agree that discussing their absence constituted prosecutorial misconduct.

{¶343} As we noted above, during opening statement, the prosecution may "refer to evidence it intends to present during trial," but it "risks a mistrial when it engages in an attempt

to actually introduce evidence." *Gilbert*, 2005-Ohio-5536, at ¶ 16.

**{¶344}** "During closing arguments, the prosecution generally has wide latitude to convincingly advance its strongest arguments and positions." *State v. Gibson*, 2003-Ohio-4910, ¶ 35 (4th Dist.), citing *State v. Phillips*, 74 Ohio St.3d 72, 90 (1995). The prosecution "may freely address what the evidence has shown and what reasonable inferences may be drawn from that evidence." *State v. Wuensch*, 2017-Ohio-9272, ¶ 38 (8th Dist.). The prosecution must, however, avoid going beyond the evidence presented in order to obtain a conviction. *E.g., State v. Smith*, 14 Ohio St.3d 13, 14 (1984) (stating that prosecutor has a duty "to avoid efforts to obtain a conviction by going beyond the evidence which is before the jury"). "[P]rosecutors must be diligent in their efforts to stay within the boundaries of acceptable argument and must refrain from the desire to make outlandish remarks, misstate evidence, or confuse legal concepts." *State v. Fears*, 86 Ohio St.3d 329, 332 (1999).

{¶345} Additionally, a court that is reviewing claims of prosecutorial misconduct during closing argument must not focus on isolated comments but must examine the prosecution's closing argument in its entirety to determine whether the prosecutor's comments prejudiced the defendant. *E.g., State v. Keenan*, 66 Ohio St.3d 402, 410 (1993). "A conviction will be reversed only where it is clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would not have found appellant guilty." *State v. Benge*, 75 Ohio St.3d 136, 141-42 (1996), citing *State v. Loza*, 71 Ohio St.3d 61, 78 (1994).

{¶346} In the case at bar, we do not believe that appellant established that the prosecution engaged in misconduct during opening statement or closing argument. Contrary to appellant's belief, the prosecution's opening statement did not refer to a nontestifying codefendant's confession. The prosecutor never stated that Nelson, the nontestifying codefendant, confessed. Furthermore, during opening statement, the prosecutor explained that he would not be introducing Nelson's actual statements. Instead, the prosecutor referred to the information that law

enforcement officers-who would be testifying-learned from interviewing Nelson.  Thus, referring to the information that officers gathered during their interviews with Nelson did not violate appellant's right to confront and cross-examine Nelson. We additionally note that appellant had a full opportunity to cross-examine the officers who testified about the interviews with Nelson.

{¶347} We likewise disagree with appellant that, during closing argument, the prosecutor committed misconduct by explaining the reason for the absence of two witnesses who ultimately did not testify.  Even if the explanation was unnecessary, appellant does not explain how any error affected the outcome of the trial.

{¶348} Consequently, we do not agree with appellant that the prosecutor committed misconduct by introducing improper argument.

**E**

*Miranda* **Violations**

**{¶349}** Appellant also argues that the prosecutor engaged in misconduct by introducing evidence that improperly commented upon his privilege against self-incrimination.

**{¶350}** In appellant's fourth assignment of error, we determined that even if the State improperly commented on appellant's privilege against self-incrimination, appellant cannot show that the State's comments affected the outcome of the case. *See* Crim.R. 52 ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded"); *State v. Jones*, 2020-Ohio-3051, ¶ 18 (an error impacts a defendant's substantial rights if "it affected the outcome of the trial"); *see also Knuff*, 2024-Ohio-902, at ¶ 240 (prosecutorial misconduct constitutes harmless error when the record contains "overwhelming evidence of [a defendant]'s guilt"); *State v. Clark*, 38 Ohio St.3d 252, 259 (1988) (prosecutorial misconduct constitutes harmless error when misconduct does not deprive a defendant of a fair trial). Thus, appellant cannot establish that we must reverse his conviction due to the prosecutor's allegedly improper statements.

**F**

**Cumulative Impact**

**{¶351}** Appellant additionally contends that, even if each instance of prosecutorial misconduct does not individually warrant reversal, the cumulative effect of the prosecutor's misconduct deprived him of a fair trial. As we concluded above, however, appellant has not identified any instances of prosecutorial misconduct that deprived him of a fair trial. *See Nicholson*, 2024-Ohio-604, at ¶ 316 (rejecting cumulative prosecutorial misconduct argument when defendant failed to identify any instances of misconduct). Moreover, the case at bar is not one of the "rare" cases in which the prosecutor's conduct affected the outcome of the trial. *See State v. Garrett*, 2022-Ohio-4218, ¶ 173 ("when the evidence is viewed in context of the entire trial, it does not show that the prosecutor's conduct prejudicially affected [the defendant]'s substantial rights").

**{¶352}** Accordingly, based upon the foregoing reasons, we overrule appellant's eighth assignment of error.

## VII

### Supplemental Assignment of Error

{¶353} In his supplemental assignment of error, appellant argues that the indictment charging him with conspiracy to commit aggravated murder or murder is fatally defective because it does not allege a substantial overt act performed in furtherance of the conspiracy. Appellant notes that in *State v. Nelson*, 2023-Ohio-3566 (4th Dist.), this court held that a similarly worded indictment was insufficient to charge conspiracy. He asserts that based upon our *Nelson* decision, we should reverse and vacate his conspiracy conviction. The State does not contest appellant's supplemental assignment of error.

{¶354} We agree with appellant that his indictment suffers from the same flaw as the indictment in *Nelson*. Accordingly, based upon the authority of *Nelson*, we sustain appellant's supplemental assignment of error, reverse the trial court's judgment convicting appellant of conspiracy, and vacate

appellant's conspiracy conviction.[13]  In all other respects, we affirm the trial court's judgment.

> JUDGMENT AFFIRMED IN PART,
> REVERSED IN PART AND VACATED
> IN PART.

---

[13] The trial court merged the offenses for sentencing purposes and sentenced appellant on the aggravated-murder offense.  We therefore need not remand this matter to the trial court for resentencing.

221

JUDGMENT ENTRY

It is ordered that the judgment be affirmed in part, reversed in part and vacated in part. Appellee shall recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Meigs County Common Pleas Court to carry this judgment into execution.

If a stay of execution of sentence and release upon bail has been previously granted, it is continued for a period of 60 days upon the bail previously posted. The purpose of said stay is to allow appellant to file with the Ohio Supreme Court an application for a stay during the pendency of the proceedings in that court. The stay as herein continued will terminate at the expiration of the 60-day period.

The stay will also terminate if appellant fails to file a notice of appeal with the Ohio Supreme Court in the 45-day period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Ohio Supreme Court. Additionally, if the Ohio Supreme Court dismisses the appeal prior to the expiration of said 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Wilkin, J.: Concur in Judgment & Opinion

For the Court

BY:_____
Peter B. Abele, Judge

222

NOTICE TO COUNSEL

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.